VELMA MCCLAIN, GENERAL ADMINISTRATRIX AND ADMINIS-
TRATRIX AD PROSEQUENDUM OF THE ESTATE OF ELNO-
RA LAMPLEY FANIEL, PLAINTIFF-RESPONDENT, v. COL-
LEGE HOSPITAL AND NEW JERSEY COLLEGE OF MEDI-
CINE AND DENTISTRY, JOHN DOE, M.D. (FICTITIOUS
NAME), RICHARD ROE, M.D. (FICTITIOUS NAME), STANLEY
GREEN, M.D. (FICTITIOUS NAME), SAM BLACK, M.D. (FICTI-
TIOUS NAME), ROBERT WHITE, M.D. (FICTITIOUS NAME),
RICHARD BROWN, M.D. (FICTITIOUS NAME), JANE DOE
(FICTITIOUS NAME), JANET ROE (FICTITIOUS NAME), BEV-
ERLY GREEN (FICTITIOUS NAME), KAREN BROWN (FICTI-
TIOUS NAME), EILEEN GRAY (FICTITIOUS NAME), DIANE
WHITE (FICTITIOUS NAME), DEFENDANTS.

Argued January 22, 1985—Decided June 5, 1985.

348

350

*Douglas J. Harper,* Deputy Attorney General, argued the cause for appellant, State Board of Medical Examiners (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney;

*James J. Ciancia,* Assistant Attorney General, and *Andrea M. Silkowitz,* Deputy Attorney General, of counsel).

*James J. Mahoney,* Newark, argued the cause for respondent (*Blume, Vazquez, Goldfaden, Berkowitz & Oliveras,* Newark, attorneys).

The opinion of the Court was delivered by

O'HERN, J.

 This case concerns the standard that shall govern the disclosure, for use in civil proceedings, of confidential investigative records relating to a licensing board's inquiry into a professional's acts. We hold that the standard is a showing of particularized need that outweighs the public interest in confidentiality of the investigative proceedings, taking into account (1) the extent to which the information may be available from other sources, (2) the degree of harm that the litigant will suffer from its unavailability, and (3) the possible prejudice to the agency's investigation. We find that, with one exception, the record before us requires a remand to evaluate the character of the materials sought in order to apply the standard we adopt.

The issue arises from a claim of medical malpractice alleged to have occurred while Elnora Lampley Faniel was a patient of the defendant College Hospital and New Jersey College of Medicine and Dentistry (U.M.D.N.J.) from February 22, 1980 through March 27, 1980. On March 10, 1980, Elnora Lampley Faniel underwent a "routine" dilation & curetage (D & C) procedure in the Obstetrics and Gynecology (OB–GYN) Unit of the defendant hospital. However, complications developed.

Based on a review of the defendant hospital's records, it appears that while Elnora Lampley Faniel was in the recovery room, the endotracheal tube placed in her throat as part of the D & C operation came out. As a result, she was unable to maintain her airway, and shortly thereafter, underwent respiratory and cardiac arrest. Attempts to restore her cardiac and

respiratory systems were successful only in returning her to a comatose state in which she apparently remained until her death in the defendant hospital on March 27, 1980. Velma McClain brings this action for wrongful death as the personal representative of the deceased.

The death of Elnora Lampley Faniel coincided with several other deaths that occurred in the OB–GYN unit of the defendant hospital. Following these deaths, investigations were initiated by the State Board of Medical Examiners (Board) with respect to the facts and circumstances and possible causes for these deaths, including that of plaintiff's decedent.

The Board states that its investigation went beyond a simple review of plaintiff's decedent's hospital records and charts. According to the Board, "numerous staff and supervisory physicians were called to testify concerning their involvement in the actual care rendered to patients and the supervision of the delivery of such care." The investigation was conducted by an executive committee of the Board. It forwarded a report dealing with the deaths to the Board for its review. The report contained the executive committee's evaluation and recommendations. Also included is the report of the executive committee's consulting obstetrician-gynecologist. Plaintiff contends that the records of the investigation contain information and evidence that is relevant to the civil litigation and otherwise unavailable to the plaintiff from other sources.[1]

---

[1] We are informed that the Board found no cause for action against several of the physicians who were responsible for the care and treatment of plaintiff's decedent. The standard for such action is gross malpractice, gross negligence, and gross incompetence which is much more than is required of plaintiff in proving a deviation from accepted medical standards. *See N.J.S.A.* 45:9–16; *N.J.S.A.* 45:1–21. Hence, although the Board apparently took no action against the involved physicians attending plaintiff's decedent, plaintiff maintains that this fact has no bearing on plaintiff's case and no bearing upon plaintiff's entitlement to the records compiled by the Board regarding plaintiff's decedent.

Following service of the plaintiff's subpoena, a motion to quash was filed on behalf of the State Board. The trial court called for an *in camera* inspection of the documents sought by plaintiff pursuant to *Beck v. Bluestein*, 194 *N.J.Super.* 247 (App.Div.1984). Following its *in camera* inspection, the trial court ruled that the documents produced by the State Board should be released to plaintiff.

On appeal, the Appellate Division affirmed the trial court in an unreported opinion. We granted the Board's motion for leave to appeal. 97 *N.J.* 650 (1984). Preliminarily, we note that our consideration is hampered by the state of the record. Neither all the materials sought nor a precise description of them is before us. Under these circumstances, we elect to review the objections generally, set forth the appropriate standards, and remand the matter to the trial court for further proceedings.

I

We start with the familiar proposition that, unless otherwise limited by an order of court, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." *R.* 4:10–2(a). Strictly speaking, there is no evidentiary privilege that applies to these records. *See Evid.R.* 23 to 40 inclusive. The Board argues, however, that the privilege to withhold official information, *Evid.R.* 34, outweighs the interest of a private litigant to gain access to the records. The controversy over executive privilege is as old as the Republic, and requires courts to balance the claims of the member of the public against the claims of government to confidentiality. *See United States v. Nixon*, 418 *U.S.* 683, 708, 94 *S.Ct.* 3090, 3107, 41 *L.Ed.*2d 1039, 1064 (1974); *United States v. Burr*, 25 *Fed.Cas.* 187, 192 (No. 14,694) (C.C.Va.1807).

In our analysis of the substantive principles to be applied to make such policy determinations and to balance such

interests, we have not sharply distinguished between the sources of the right to review or the right to have access to public records. In *Irval Realty v. Board of Pub. Util. Comm'rs*, 61 *N.J.* 366 (1972), the Court stated:

> A person seeking access to public records may today consider at least three avenues of approach. He may assert his common law right as a citizen to inspect public records; he may resort to the Right to Know Law, *N.J.S.A.* 47:1A–1 *et seq.*, or, if he is a litigant, he may avail himself of the broad discovery procedures for which our rules of civil practice make ample provision. [*Id.* at 372.]

At common law, however, a citizen was required to demonstrate some "personal" or "particular" interest in the material sought to be examined. *Id.* In order to overcome this requirement and make official governmental records available to the general public for inspection and copying, the Legislature adopted a state Right to Know Law, *N.J.S.A.* 47:1A–1 to –4. However, we have interpreted that law as not embracing a definition of public records equivalent to a common-law definition of public records. *Nero v. Hyland*, 76 *N.J.* 213, 221 (1978).[2] Our common-law definition of a public record is broader than that contained in the Right to Know Law. A public record under common law is

> one required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said, or done, or a written memorial made by a public officer authorized to perform that function, or a writing filed in a public office. The elements essential to constitute a public record are * * * that it be a written memorial, that it be made by a public officer, and that the officer be authorized by law to make it. [*Id.* at 222 (citing *Josefowicz v. Porter*, 32 *N.J.Super.* 585, 591 (App.Div.1954), quoting 76 *C.J.S.* Records § 1, p. 112, *cited in Irval Realty, supra*, 61 *N.J.* at 375).]

■ However, the existence of a cognizable common-law interest in obtaining the materials that are part of the record does not grant an absolute right to the documents. In *Nero*,

---

[2]The Right to Know Law defines public records as those required by law to be made, maintained or kept on file. *N.J.S.A.* 47:1A–2. *Nero, supra,* held that a State Police character investigation of an applicant for a public position was not such a record. On the other hand, it was held to be a common-law public record. 76 *N.J.* at 220–21.

*supra,* 76 *N.J.* 213, the Court held that there was no fixed rule for determining whether disclosure is justifiable. It would balance, in each case, the individual's rights to the information against the public interest in the confidentiality of the file. *Id.* at 223–24. Because the problems are recurrent, we shall attempt to state, in some greater detail, considerations that may be applied to make such a balance.

## II

"The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know what their government is up to." *Environmental Protection Agency v. Mink,* 410 *U.S.* 73, 105, 93 *S.Ct.* 827, 845, 35 *L.Ed.*2d 119, 142 (1973) (Douglas, J., dissenting) (quoting Henry Steele Commager, "The New York Review of Books," Oct. 5, 1972, p. 7). New Jersey has a strong, expressed public policy in favor of open government, as evidenced by our Open Public Meetings Act, *N.J.S.A.* 10:4–6 to –21 and our Worker and Community Right to Know Law, *N.J.S.A.* 34:5A–1 to –31. Our decisional law has reflected this tradition towards openness. "[I]n a democracy, the citizens generally have the right to know the truth about all parts of their government, because, without public knowledge of the realities of governmental activities, essential reforms of those activities will be hindered" (quoting Justice (then Judge) Proctor in *Stack v. Borelli,* 3 *N.J.Super.* 546, 552 (Law Div. 1949)).

As noted, New Jersey has not adopted a comprehensive freedom-of-information act. Our Right to Know Law is limited in its scope. Moreover, it does not contain specific substantive standards that define exclusions from its coverage, but rather leaves it to the executive to delineate by executive order those materials that are not subject to disclosure. *See Accident Index Bureau, Inc. v. Hughes,* 46 *N.J.* 160 (1965). Absent such

determination, it remains for us to develop, on a case-by-case basis, the articulated principles that shall guide courts in making such decisions.

Although our Right to Know Law is not coterminous with the common-law right of access to public records, we believe that our common-law principles will be better informed by reference to concepts that have gained acceptance in jurisdictions whose freedom-of-information laws include such common-law records and substantive standards for determination of materials that are exempted from disclosure. We refer to such codes only for the guidance they provide. The model for most state freedom-of-information laws is the federal Freedom of Information Act (FOIA), 5 *U.S.C.* § 552 (1966). In the decade after the enactment of the federal FOIA, as many as twenty-four states had adopted comparable legislation. Comment, "Public Inspection of State and Municipal Executive Documents: 'Everybody, Practically Everything, Anytime, Except * * * '," 45 *Fordham L.Rev.* 1105 (1977).

The prevalent pattern of such legislation is the inclusion of exemptions that are relevant to the materials that we shall consider. These standards which have been incorporated in the federal FOIA and state freedom-of-information acts, have drawn from a judicial consensus on resolution of access to government records: "Specific statutory exemptions [from disclosure] are legislative attempts to predetermine the results of the balancing test on a categorical basis." Project, "Government Information and the Rights of Citizens," 73 *Mich.L.Rev.* 971, 1176 (1975). Common themes run throughout the exemptions. The majority of states exempt specific types of records, the disclosure of which would constitute an invasion of personal privacy; many states shield confidential information and trade secrets; finally, and relevant to our considerations here, a majority of states provide exemptions for investigatory files and intra- or inter-agency memoranda and correspondence. Project, *supra,* 73 *Mich.L.Rev.* at 1172–74. These statutory exemptions are reflections of principles that developed prior to

the full emergence of statutory freedom-of-information laws. *See* H. Cross, *"The People's Right to Know,"* (1953). For our purposes the materials to be described hereinafter occasion us to focus upon two common statutory exemptions.

## A.

### Investigatory Files and Records

As noted, a majority of state freedom-of-information laws contain an exemption for law enforcement and investigatory information. The term "law enforcement" extends beyond criminal proceedings. *Bristol-Myers Co. v. F.T.C.*, 424 *F.*2d 935, 939 (D.C.Cir.), *cert.* den., 400 *U.S.* 824, 91 *S.Ct.* 46, 27 *L.Ed.*2d 52 (1970). Characterizing a file as investigatory, however, does not foreclose access. Routine review of government functions is not sheltered, but when "the inquiry departs from the routine and focuses with special intensity upon a particular party, an investigation is under way." *Center for Nat'l Policy Review on Race & Urban Issues v. Weinberger,* 502 *F.*2d 370, 373 (D.C.Cir.1974). But even in those circumstances, discovery is not fully foreclosed. The exemption "invites case-by-case consideration of whether access would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest." *Reinstein v. Police Comm'r of Boston,* 378 *Mass.* 281, 290, 391 *N.E.*2d 881, 886 (1979).[3]

---

[3]Congress amended FOIA in 1974 to limit the scope of the exemption and it now covers "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation ... confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel." 5 *U.S.C.* § 552(b)(7).

A familiar method of resolving the tension between the investigating agency's interest in protecting its investigative techniques, procedures or sources of information is for the reviewing court to allow access to the raw data in the files, treating them as factual matter submitted to the agency as a matter of routine. *See Weinberger, supra,* 502 *F.*2d at 373. Thus, for example, in *Reinstein v. Police Comm'r of Boston, supra,* the court authorized a case-by-case analysis of investigatory materials collected by the Boston City Police concerning investigative procedures touching on firearms cases under departmental rules. That court found "no ground for uneasiness about letting the plaintiff have the times and places of incidents or the like or aggregated facts resembling those referred to above by way of illustration." *Reinstein, supra,* 378 *Mass.* at 290, 391 *N.E.*2d at 886; *see also Denver Publishing Co. v. Dreyfus,* 184 *Colo.* 288, 520 *P.*2d 104 (1974) (examination of autopsy report can be conditioned upon court's screening contents to excise information that might prejudice pending criminal investigation).

Related in kind is the principle that opinion contained in the investigative report would not be subject to disclosure or use in pending trials. A familiar example is the procedure whereby the accident reports of the National Transportation Safety Board are subject to disclosure, provided that none of the opinions contained therein may be used in any civil proceeding, nor may any employee of the National Transportation Safety Board be called upon to testify with respect to anything other than factual matters. *See McCandless v. Beech Aircraft Corp.,* 697 *F.*2d 1156 (D.C.Cir.1983).

Similar concepts apply to hospital committee proceedings. Many states have enacted statutes that protect the proceedings and reports of hospital review committees from discovery although New Jersey has adopted a less protective statute. *See* R. Hall, "Hospital Committee Proceedings and Reports: Their Legal Status," 1 *Am.J.L. & Med.* 245, 274–75 (1975); *see also*

*Cronin v. Strayer*, 392 *Mass.* 525, 467 *N.E.*2d 143 (1984) (medical peer review committee's records were considered a subject of discovery in a physician's defamation action against another physician who reported him to committee); *Bredice v. Doctors Hospital, Inc.*, 50 *F.R.D.* 249 (D.D.C.1970), aff'd 479 *F.* 2d 920 (D.C.Cir.1973) (reports of defendant hospital's staff not subject to discovery without showing of exceptional necessity); *Sherman v. District Court*, 637 *P.*2d 378 (Colo.1981) (court declined to expand the area of privilege absent legislative action).

*N.J.S.A.* 2A:84A–22.8 prohibits disclosure of "data secured by and in the possession of utilization review committees established by any certified hospital or extended care facility in the performance of their duties * * *." It contains an exception in favor of disclosures to "government agencies in the performance of their duties," but it is questionable whether this applies to courts. *See Young v. King*, 136 *N.J.Super.* 127 (Law Div.1975). Thus, it has been held that this respect for peer-review materials is familiar in its content to the work-product doctrine of *Hickman v. Taylor*, 329 *U.S.* 495, 67 *S.Ct.* 385, 91 *L.Ed.* 451 (1947). Recently courts have recognized a qualified privilege of self-examination or self-critical analysis as furthering the public interest. Note, "The Privilege of Self-Critical Analysis," 96 *Harv.L.Rev.* 1083, 1099–1100 (1983); *Wylie v. Mills*, 195 *N.J.Super.* 332, 337 (Law Div.1984). Although we deal here not with peer review but with a licensing board's investigation, the concerns are similar. In short, disclosure of the materials involved in an internal investigation into health-care service invokes serious and important questions of public policy deserving careful consideration by the courts. An applicant seeking the opinions, conclusions, sources of information and investigative techniques of the agency should demonstrate a need more compelling than the agency's recognized interest in confidentiality.

## B.

### Intra-agency Memoranda

Another prevalent exclusion from discovery is provided for in inter-agency or intra-agency memoranda. The theory behind this exemption is self-evident. A full and free exchange of discourse would be hampered if the preliminary thought processes of agency members were bared. Again, this exemption has not been regarded as all-exclusive, and saying that the document is an intra-agency memorandum does not make it so.

In *Environmental Protection Agency v. Mink, supra,* 410 *U.S.* 73, 93 *S.Ct.* 827, 35 *L.Ed.*2d 119, the leading case construing the FOIA's exemption for inter-agency or intra-agency memoranda, "the Supreme Court distilled a commonsense, flexible rule from the legislative history and judicial opinions dealing with the privilege of executive agencies to withhold information from their adversaries," holding "that the exemption authorized an agency to withhold 'materials reflecting deliberative or policy-making processes' but required disclosure of 'purely factual, investigative matters'." *Moore-McCormack Lines, Inc. v. I.T.O. Corp. of Baltimore,* 508 *F.*2d 945, 948 (4th Cir.1974) (citing *Mink, supra,* 410 *U.S.* at 89, 93 *S.Ct.* at 837, 35 *L.Ed.*2d at 133). Thus, "[i]nferences about the cause of an accident drawn from facts revealed by the investigation, though labeled as opinions or conclusions, are not exempt under the guise of deliberative or policy-making material." *Moore-McCormack Lines, supra,* 508 *F.*2d at 949; *see Robertson v. Butterfield,* 498 *F.*2d 1031 (D.C.Cir.1974), rev'd on other grounds *sub nom. Administrator, FAA v. Robertson,* 422 *U.S.* 255, 95 *S.Ct.* 2140, 45 *L.Ed.*2d 164 (1975) (intra-agency memorandum analyzing airline's operational and maintenance performance is discoverable).

The *Mink* Court further held that the act should not be taken "to embrace an equally wooden exemption permitting the withholding of factual material otherwise available on discovery merely because it was placed in a memorandum with matters of

law, policy, or opinion." 410 *U.S.* at 91, 93 *S.Ct.* at 838, 35 *L.Ed.*2d at 134. That approach "continues to extend to the discovery of purely factual material appearing in those documents in a form that is severable without compromising the private remainder of the documents." *Id.* From these decisions we may distill the conclusion that we should expect practical, common-sense applications of rules of discovery that are familiar to trial courts in order to resolve most of the problems of confidentiality. But to the extent that the memorandum reflects the deliberative processes of the agency, a greater showing of need should be demonstrated by the applicant than a mere interest in the proceedings.

## III

With these principles in mind, we turn to their application to the facts of this case. In *State v. Doliner*, 96 *N.J.* 236 (1984), we reviewed the circumstances in which government as a private litigant could obtain access to confidential grand-jury information. We emphasized that the initial focus must be upon the nature of the materials sought. The balancing process must be concretely focused upon the relative interests of the parties in relation to these specific materials. There is a qualitative difference in the nature of information that an investigative agency acquires. Useful guidelines for the determination of this balancing were stated by the California Supreme Court:

Implicit in each assessment is a consideration of consequences—i.e., the consequences to the litigant of nondisclosure, and the consequences to the public of disclosure. The consideration of consequences to the litigant will involve matters * * * including the importance of the material sought to the fair presentation of the litigant's case, the availability of the material to the litigant by other means, and the effectiveness and relative difficulty of such other means. The consideration of the consequences of disclosure to the public will involve matters relative to the effect of disclosure upon the integrity of public processes and procedures. [*Shepherd v. Superior Court*, 17 *Cal.*3d 107, 126, 130 *Cal.Rptr.* 257, 267–68, 550 *P.*2d 161, 171–72 (1976) (footnote omitted).]

This standard is similar in context to the standard in *Doliner*. *See also Cashen v. Spann*, 77 *N.J.* 138, 142 (1978) ("substantial

showing of a need" for informer's name required in civil action); *River Edge Savings and Loan Ass'n v. Hyland,* 165 *N.J.Super.* 540, 544 (App.Div.1979) (in civil cases, "a greater degree of respect" for confidentiality is required). It is flexible and adaptable to different circumstances and sensitive to the fact that the requirements of confidentiality are greater in some situations than in others. The process has been described as calling for an "exquisite weighing process by the trial judge." *Beck v. Bluestein, supra,* 194 *N.J.Super.* at 263. As the considerations justifying confidentiality become less relevant, a party asserting a need for the materials will have a lesser burden in showing justification. If the reasons for maintaining confidentiality do not apply at all in a given situation, or apply only to an insignificant degree, the party seeking disclosure should not be required to demonstrate a compelling need.

■ In a case like this, there is an obvious interest of the agency in the confidentiality of its proceedings. The law provides that the proceedings and deliberations of the hospital Board of Medical Examiners shall be confidential. *See N.J.S.A.* 45:9–19.1 and 45:9–19.3. This pattern of confidentiality is familiar in the many contexts of professional licensing investigations. *See, e.g.,* Annotation, "Confidentiality of Proceedings or Reports of Judicial Inquiry Board or Commission," 5 *A.L.R.* 4th 730 (1981); Annotation, "Inspection of Complaints Against Attorneys," 83 *A.L.R.*3d 777 (1978); Annotation, "Pretrial Discovery in Disciplinary Proceedings Against Physician," 28 *A.L.R.*3d 1440 (1969) (in a disciplinary proceeding against a physician, pretrial discovery is available to the accused physician; however, with respect to reports and documents collected by board investigators, there must be some additional showing of need and specificity in order to secure discovery of these documents).

Ordinarily, then, a high degree of necessity for production of materials considered important to the investigative process should obtain since such investigations are obviously a matter

of significant public interest. On the other hand, it is equally apparent that the litigant in this case has an extraordinary interest in gaining access to the information. Elnora Lampley Faniel has suffered the ultimate injury, an untimely death, that may be attributable to the fault of the medical institution, or its employees, or physicians servicing the hospital. It is extremely difficult for us to evaluate the relative need for the information because, at the time of oral argument, we were informed that plaintiff's counsel had no expert's report with respect to the circumstances of the client's case. This, notwithstanding the fact that hospital records themselves are always available for discovery.

As noted, we have been informed that the materials as to which the controversy exists include the following:

1. Copy of the Executive Committee report to the Board dealing with the treatment of Elnora Lampley Faniel.

 This internal recommendation of the Board of Medical Examiners Executive Committee is entitled to a high degree of protection on two grounds. First, it is an intra-agency memorandum, entitled to confidentiality, and second, it also presumably contains matters of opinion in the committee's investigation that may or may not have been acted upon by the agency in its final deliberation and conclusion. Again, we would expect that the Court would apply the *Mink* rationale to determine whether any of its contents is strictly factual and would conclude that such information would be reasonably available to the plaintiff, excising matters of opinion or conjecture on the part of the agency members. Whether the need for its conclusory contents is so compelling and the prejudice so great due to their unavailability, will be for the trial court to decide. We note that this is not the final action of the Board and, as such, is entitled to a high degree of confidentiality.

2. Copy of the report of the Board's consulting expert reviewing the pertinent patient records and findings with regard to Elnora Lampley Faniel.

 A consultant acts on behalf of the agency. To that extent the consultant's opinion is the opinion of the agency.

*See Harless v. State ex. rel. Schellenberg,* 360 *So.*2d 83 (Fla. App.1978) (evaluation of consultants to public authority not discoverable because of privacy interests of the applicants). As such, the opinions and conclusions therein are entitled to a high degree of confidentiality. In this case we need not be greatly concerned about this issue because, through inadvertence, a copy of the consultant's report has already been given to plaintiff's counsel without identification of the name of the consulting expert. It seems unlikely to us that the name of the expert will be important to the plaintiff's discovery.

3. Copy of transcript of licensees' testimony adduced at the Executive Committee's investigative inquiry relevant to the care provided to Elnora Lampley Faniel.

 There would appear to be a diminished interest in the privacy of some of these materials. They are obviously not the product of any confidential sources or investigative techniques employed by the Board of Medical Examiners. We would assume, for the most part, that the physicians who testified were treating physicians, and thus, disclosed in the medical reports of the hospital. These are the most obvious sources of factual information. *See Beck v. Bluestein, supra,* 194 *N.J.Super.* at 263. On the other hand, the colloquy may disclose certain of the internal practices and procedures of the Board that it chooses not to reveal. In this respect, it would be similar to the actual transcript of the proceedings before a grand jury as opposed to exhibits and other evidence assembled before the grand jury. In addition, staff physicians other than treating physicians may have volunteered opinions, conclusions, or information that they would not venture but for the confidential nature of the process. The Board should have the opportunity to point out to the trial court any specific provisions in the transcripts that raise such concerns.

There may be other materials at issue that have not been identified. The trial court shall review the claims of the parties with respect to the specific materials and in light of the general principles announced.

The judgment of the Appellate Division is affirmed in part and reversed in part and the matter is remanded to the trial court for further proceedings in accordance with this opinion.

*For affirmance in part, reversal in part and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.