Andrew KONRADY and Ardith
Konrady, Plaintiffs,

v.

Joseph E. OESTERLING, M.D., Mayo
Foundation, a Minnesota non-profit as-
sociation, and American Medical Sys-
tems Corp., a Minnesota corporation,
Defendants.

Civ. No. 4–92–904.

United States District Court,
D. Minnesota,
Fourth Division.

June 30, 1993.

Robert Hajek, Minneapolis, MN, for plain-
tiff.

Paul B. Klaas, Minneapolis, MN, for defen-
dant Mayo Foundation.

## ORDER AND MEMORANDUM

BOLINE, United States Magistrate
Judge.

Before the Court is plaintiffs' motion to
compel discovery of certain interrogatories
dealing with information exchanged among
the defendants in this medical malpractice
and products liability action. Defendant
Mayo Foundation (Mayo) resists production
citing Minnesota Stat. § 145.66 which prohib-
its the disclosure of communications with a
"review organization." Because this Court
finds Mayo's organization does not constitute
a review organization under the statute,
**PLAINTIFFS' MOTION TO COMPEL IS
GRANTED.**

### *BACKGROUND*

Plaintiff in this diversity action participat-
ed in a clinical investigation of a new medical
device conducted by Mayo. The investiga-
tion, under an approved Investigational De-
vice Exemption (IDE) application, involved
surgical implantation of a product manufac-
tured by defendant American Medical Sys-
tems (AMS). The product is described as a
"stent" and is used as an alternative to an

operation called a transurethral resection of the prostate (TURP) for men suffering from enlarged prostates. Since the surgical implantation on September 18, 1990, plaintiff claims he has experienced irritation, pain, and a variety of problems and has filed the instant action. Plaintiff asserts medical malpractice as well as products liability theories including failure to warn, failure to test, defective design, and defective manufacture. (Complaint at ¶¶ 13–16).

Plaintiffs seek discovery of the following information which was contained in their Interrogatory # 3:

State the date or dates during which the Institution Review Board assessed, approved or in any way reviewed or discussed the research study in which Andrew Konrady participated.

For each occasion state the following:

a. The topic of discussion;

b. All persons present at each such meeting;

c. If any approvals were given, indicate the nature and extent of said approvals;

d. Were any notes, minutes or any recordings taken of such meeting.

(Aff. of Hajek at Exh. A).

Plaintiff, at the hearing on this motion, is particularly interested in obtaining reports submitted to the board by Dr. Oesterling.

Defendant Mayo Foundation objects to this discovery on two grounds: Mayo asserts a general objection to the interrogatories proffered as irrelevant; and with respect to interrogatory 3 in particular, Mayo objects citing Minnesota's Peer Review statute, which protects from discovery all data and information acquired by a "review organization." Minn.Stat. § 145.64.

## DISCUSSION

### I.

█ Mayo's first general objection on grounds of relevance is overruled. Plaintiff claims, *inter alia*,. that he was not provided with proper informed consent and that he suffered adverse effects from the surgical procedure and device. The information plaintiff seeks relates to communications made about him and his condition and are undoubtedly relevant.

█ As to Mayo's objection on grounds of statutory privilege, the Minnesota statute at issue prohibits in relevant part:

All data and information acquired by a review organization, in the exercise of its duties and functions, shall be held in confidence, shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization, and shall not be subject to subpoena or discovery. No person described in section 145.63 shall disclose what transpired at a meeting of a review organization except to the extent necessary to carry out one or more of the purposes of a review organization. The proceedings and records of a review organization shall not be subject to discovery or introduction into evidence in any civil action against a professional arising out of the matter or matters which are the subject of consideration by the review organization ...

Minn.Stat. § 145.64 (1990).[1]

The linchpin issue is whether an Investigational Review Board qualifies as a review organization under the Minnesota statute.

A review organization is defined in the Minnesota statute as:

[A] committee whose membership is limited to professional and administrative staff, except where otherwise provided for by state or federal law, and which is established by a hospital, by a clinic, by one or more state or local associations of professionals, by an organization of professionals from a particular medical institution, by a health maintenance organization as defined in chapter 62D, by a nonprofit health service plan corporation as defined in chapter 62C or by a professional standards review organization established pursuant to Unit-

---

1. The statute also shields from *admission* into evidence, but not from discovery, any patient care guidelines established by a review organiza-

tion. Minn.Stat. § 145.65. The statute was amended in 1992 in areas not relevant to the instant case.

ed States Code, title 42, section 1320c–1 [2] et seq. . . . to gather and review information relating to the care and treatment of patients for the purposes of:

(a) evaluating and improving the quality of health care rendered in the area or medical institution;

(b) reducing morbidity or mortality;

(c) obtaining and disseminating statistics and information relative to the treatment and prevention of diseases, illness and injuries;

(d) developing and publishing guidelines showing the norms of health care in the area or medical institution;

(e) developing and publishing guidelines designed to keep within reasonable bounds the cost of health care;

(f) reviewing the quality or cost of health care services provided to enrollees of health maintenance organizations;

(g) acting as a professional standards review organization pursuant to United States Code, title 42, section 1320c–1 et seq.;

(h) determining whether a professional shall be granted staff privileges in a medical institution or whether a professional's staff privileges should be limited, suspended or revoked; or

(i) reviewing, ruling on, or advising on controversies, disputes or questions between: . . . (5) professionals or their patients and the federal, state, or local government, or agencies thereof;

Minn.Stat. § 145.61 Subd. 5 (1990).

Investigational Review Boards (IRB's), on the other hand, are defined in a highly regulated federal scheme which must be followed whenever a new medical device is tested.[3] IRB's are comprised of boards or committees formally designated by an institution to review, approve, and monitor biomedical research involving human subjects. An IRB is defined as:

[A]ny board, committee, or other group formally designated by an institution to review, to approve the initiation of, and to conduct periodic review of, biomedical research involving human subjects. *The primary purpose of such review is to assure the protection of the rights and welfare of the human subjects.* The term has the same meaning as the phrase *institutional review committee* as used in section 520(g) of the [Federal Food, Drug, and Cosmetic] act.

21 C.F.R. § 56.102(g) (first emphasis added).

The IRB is required to include at least five members of varying backgrounds including one member who is not affiliated with the institution and one whose primary concern is non-scientific. 21 C.F.R. § 56.107(a)–(e). The IRB is responsible for reviewing, modifying, and approving or disapproving all research activities covered by the federal regulations. Included in that responsibility is the

---

2. The section deals with quality control review organizations.

3. Part of the federal scheme is the Medical Device Amendments Act (MDA) to the Food, Drug and Cosmetic Act (the Act). Implementing regulations for the Act are contained generally in 21 C.F.R. §§ 812.1–.150 (1992). [Hereinafter all references to the C.F.R. will be to the 1992 edition unless otherwise indicated.]

To obtain an Investigational Device Exemption, the sponsor or manufacturer submits detailed specifications, procedures, and analysis regarding the design and manufacture of the device; its anticipated risks and benefits; and an approval of the Institutional Review Board of the researching institution. *Id.* This information is submitted to the FDA in the form of an application for approval of an Investigational Device Exemption (IDE) under the Act. The application contains procedures for the protection of patients who participate in the study. The sponsor, investigator, and institution are required by FDA regulations and by the Act to follow all of the procedures contained in the approved IDE. 21 U.S.C. §§ 360j(g)(2)(B)(ii); 360j(g)(5); 21 C.F.R. 812.35. A manufacturer cannot begin a clinical investigation absent both FDA and IRB approval of the IDE application. 21 C.F.R. §§ 812.42; 812.60. The FDA approved the IDE application on the device at issue on April 12, 1990.

The approved IDE contains a detailed description of the manufacturing and quality control procedures in the "Investigational Plan." Included in the Investigational Plan are procedures and follow-up care anticipated to be used by physicians participating in the study. Importantly, the Investigational Plan also describes evaluation criteria and documentation procedures which will enable the manufacturer and the FDA to evaluate the device as the investigation proceeds. 21 C.F.R. § 812.25(c), (e).

duty of an IRB to 1) require that informed consent be obtained from virtually all subjects; 2) require documentation of informed consent (21 C.F.R. § 56.109(b), (c)); and 3) prepare and maintain certain records (21 C.F.R. § 56.115). With respect to the record keeping requirement, an IRB must keep:

(1) Copies of all research proposals reviewed, ... approved sample consent documents, progress reports submitted by investigators, and *reports of injuries to subjects;*

(2) Minutes of IRB meetings ... [including] a written summary of the discussion of controverted issues and their resolution;

\* \* \* \* \* \*

(4) Copies of all correspondence between the IRB and the investigators.

21 C.F.R. § 56.115(a) (Emphasis added).

The prescribed records must be retained for at least three years after the research has been completed and, importantly, "the records shall be accessible for inspection and copying by authorized representatives of the Food and Drug Administration at reasonable times and in a reasonable manner." 21 C.F.R. § 56.115(b). The FDA may refuse to consider an application if an IRB or institution refuses inspection or doesn't comply with the promulgated regulations. 21 C.F.R. §§ 56.115(c), 56.120, 56.121. The IRB must also conduct continuing review of the investigation. 21 C.F.R. § 812.64.

## II.

Mayo asserts that its IRB falls within the evidentiary shield of the Minnesota statute even though it is not an entity named by the statute. This Court disagrees and finds that the IRB is not a "review organization" because: 1) the purposes of the organizations differ from those described in the statute; and 2) the element of confidentiality underlying the statutory privilege is absent.

### A. Differing Purposes.

■ The purpose, function, and operation of an IRB is wholly different than the purpose, function and operation of a peer review board as contemplated by, not only the Minnesota statute, but virtually all similar state statutes. *See generally* Charles David Creech, *The Medical Review Committee Privilege: A · Jurisdictional Survey,* 67 N.Car.L.Rev. 179 (Nov. 1988); B. Abbott Goldberg, *The Peer Review Privilege: A Law In Search Of A Valid Policy,* 10 Am. J.Law & Medicine 151, 151–54 (1984). The peer review privilege [4] is designed to facilitate the frank exchange of information among professionals without fear of reprisals in civil lawsuits.[5] The goal is the improvement of patient care. *In re Parkway Manor Healthcare Center,* 448 N.W.2d 116, 120 (Minn.Ct.App.1989) *rev. denied* Jan. 18, 1990; *Kalish v. Mt. Sinai Hospital,* 270 N.W.2d 783, 785 (Minn.1978) ("These statutes ... are designed to serve the strong public interest in improving the quality of health care.").[6]

The privilege was first judicially recognized in *Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249, 251 (D.D.C.1970), *aff'd,* 479 F.2d 920 (D.C.Cir.1973). There, a plaintiff in a medical malpractice case sought to discover hospital "peer review" committee minutes and reports. The court pointed out that ongoing "self-critical analysis" plays a crucial role in ensuring the continual improvement

---

**4.** The term privilege, while commonly ascribed to peer review statutes, is not an entirely accurate description. *See Coburn v. Seda,* 101 Wash.2d 270, 272–73, 677 P.2d 173, 175–76 (1984) (comparing a privilege with immunity from discoverability and concluding that policies favoring both underlie Washington's peer review statute).

**5.** For a good overview and discussion of the confidentiality of Peer Review Proceedings *see* Note, Christofer S. Morter, *The Health Care Quality Improvement Act Of 1986: Will Physicians Find Peer Review More Inviting?,* 74 Va.

L.Rev. 1115 (1988) notes 85–126 and accompanying text.

**6.** For a thorough background on peer review functions and rationales *see generally,* Comment, *Medical Peer Review Protection In The Health Care Industry,* 52 Temp.L.Q. 552, 554–65 (1979); Paula B. Grant, *Survey: Developments in Maryland Law, 1990–91,* 51 Md.L.Rev. 726 (1992) (ensuring high quality, cost-effective medical care depends in large part upon the willingness of physicians to police themselves by engaging in honest and critical peer review).ʹ

of patient care in hospitals.[7] *Id.* at 250. The court further noted that the peer review process was conducted with the expectation that communications would remain confidential, and that confidentiality was necessary in order to protect the unimpeded flow of ideas and advice. *Id.* Because of the "overwhelming public interest" in protecting this process, the court concluded that peer review materials were subject to a qualified privilege. *Id.* at 251.

The Minnesota statute, enacted a year after *Bredice*, has infrequently been interpreted in published decisions of Minnesota courts. Nevertheless, the Minnesota court's most recent analysis of the privilege in *Parkway*, is instructive. There, the court inquired into the nature of the committee from whom information was sought and concluded that the committee was not a "review organization" under the statute. The court considered two issues: first whether a nursing home's quality assurance documents were shielded from discovery under Minn.Stat. § 145.64 (1988); second, if not, would the common-law privilege for self evaluation data protect the documents from discovery. *Parkway*, 448 N.W.2d at 118.

The *Parkway* court concluded the quality assurance division did not constitute a review organization under the statute since the committee at issue included members who were not professionals and since federal law did not require such composition.[8] *Id.* at 119–20. The court found that policy reasons did not compel extending the statute to include the quality assurance division. In this regard, the court noted that statutory privileges must be narrowly limited to their purposes. *Id.* (citations omitted).

On the second issue, the *Parkway* court rejected the invitation to create a common law privilege for self-evaluation as enunciated in *Bredice*. The court noted the judicial hostility towards evidentiary privileges, and the lack of statutory authority to recognize a new privilege. *Parkway*, 448 N.W.2d at 121.

Here, as in *Parkway*, it is clear that the IRB is not a statutory review organization. Unlike a true peer review committee, an IRB is charged with management and oversight of research involving human subjects. Rather than conduct "peer review", and IRB conducts "process review" not enumerated by the Minnesota statute. *See* Minn.Stat. § 145.61. The goal of an IRB is the protection of human subjects "rights and welfare" with respect to a specific investigational device. One of the ways that protection is achieved is by the collection and dissemination of information about the human subjects to the FDA, to the manufacturer, and even to the public.[9] Recordkeeping and the inspection of those records by the FDA is thus critical to the operation of the IRB. An IRB does not exist to formulate or generally review hospital policies and personnel; rather, it exists to carry out certain functions prescribed by the federal government to further the advancement of medical science. The specificity of this function, and its lack of impact on the overall control of patient care, distinguish the Institutional Review Board from the types of functions described in the Minnesota statute. *Cf. Davidson v. Light*, 79 F.R.D. 137, 139 (D.Colo.1978) (the public interest in promoting health care improvements by preserving the confidentiality of hospital staff meetings did not immunize the report of an infection control committee from discovery where the role of the committee

**7.** The privilege has been explored in a variety of factual settings under several different names. *See e.g., Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423, 425 (9th Cir.1992) ("privilege of self-critical analysis"); *In re Burlington N., Inc.,* 679 F.2d 762, 765 (8th Cir.1982) ("self-critical subjective analysis privilege"); *Pagano v. Oroville Hosp.,* 145 F.R.D. 683, 690 (E.D.Cal. 1993) ("peer review privilege"); *Hoffman v. United Telecommunications, Inc.,* 117 F.R.D. 440, 442 (D.Kan.1987) ("self-evaluation" privilege); *Witten v. A.H. Smith & Co.,* 100 F.R.D. 446, 449 (D.Md.1984) ("critical self-analysis" privilege), *aff'd* 785 F.2d 306 (4th Cir.1986);

*Westmoreland v. CBS, Inc.,* 97 F.R.D. 703 (S.D.N.Y.1983) ("privilege for confidential self-evaluative analysis"); *Rosario v. New York Times Co.,* 84 F.R.D. 626, 631 (S.D.N.Y.1979) ("self-examination" privilege).

**8.** Here, however, the composition of the IRB is established under federal law and thus would be permissible under the statute.

**9.** *See e.g.,* 21 C.F.R. § 812.38(b) (providing that the FDA will make publicly available a "detailed summary" of information related to the safety and effectiveness of banned devices).

which prepared the report was not to formulate or review hospital policies generally); *Coburn v. Seda*, 677 P.2d at 178 (remanding to the trial court for factual finding whether the committee at issue came within the statute; factors the trial court should consider include whether function of committee is patient care or retrospective review).

## B. Confidentiality

The primary purpose of the Minnesota statute is inhibit the chilling effect on candor that exists absent the privilege. *Parkway*, 448 N.W.2d at 118–19 (statute encourages the medical profession to police its own activities). The theory is that a confidential environment will encourage physician candor and participation in the process. This, the theory goes, will result in better doctors, and ultimately better health care.[10]

However, at issue in the case sub judice, are matters not susceptible to enhancement under a promise of confidentiality; rather, they are matters governed under specific federal regulation on investigational devices. *See e.g.* 21 C.F.R. §§ 56.109, 56.115 (1992). The significance of this fact is that unlike the scenario presented in true peer review cases such as *Bredice*, discovery in IRB cases will not result in diminished candor in peer reviews or diminished quality of health care.[11]

Unlike true peer review materials, hospitals can claim no expectation that their IRB reports or even material provided to the IRB will not be revealed.[12] Regulations provide that, "Upon request or on its own initiative, FDA shall disclose to an individual on whom an investigational device has been used a copy of a report of adverse effects relating to that use." 21 C.F.R. § 812.38(c). If the FDA is empowered to disclose an adverse effect report, then the communication was not made with an expectation of confidentiality.[13]

Thus, the statutory privilege rationale which presumes that the communications were to he held confidential[14] is absent here.[15] The overwhelming public interest here is not to encourage candor among professionals practicing health care; rather, it is to encourage scientific integrity in human biomedical research. This integrity is better fostered under the watchful eye of public

10. The concept behind improving health care through qualified immunity from liability for peer review participation was also embodied in federal legislation in the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101–52 (Supp.1987) [HCQIA]. *See generally* Susan L. Horner, *The Health Care Quality Improvement Act of 1986: Its History, Provisions, Applications, and Implications*, 16 Am.J.L. & Med. 455 (1990). The HCQIA became effective on September 1, 1990 and created a national practitioner database listing adverse actions involving hospital privileges, and medical malpractice payments on practitioners.

11. If anything, the privilege sought here is more analogous to a scientific or academic privilege rather than a peer review privilege. *See Plough Inc. v. National Academy of Sciences*, 530 A.2d 1152, 1158 (D.C.Cir.1987) (party was not entitled to discovery of academy document which reflected closed deliberation of committee concerning methodology and documents reflecting confidential internal deliberations).

12. That is not to say that the voluntariness of the review is the dispositive characteristic. To the contrary, true peer review is a prerequisite to hospital accreditation by the Joint Commission on Accreditation of Hospitals. *See* Joint Commission On Accreditation Of Hospitals, Accreditation Manual For Hospitals (1990). Peer review

is also required under an assortment of federal and state laws.

13. Other regulations require that certain information be made available for FDA inspections. *See e.g.*, 21 C.F.R. § 56.115(b) ("the records shall be accessible for inspection and copying by authorized representatives of the Food and Drug Administration at reasonable times and in a reasonable manner."); 21 C.F.R. § 812.38 (providing for disclosure of detailed summaries data for banned devices).

14. Patient anonymity and manufacturer proprietary trade information should be distinguished from confidentiality; obviously patient names are not made public and other provisions protect the manufacturers' proprietary interests.

15. *Cf. Emerson Electric Co. v. Schlesinger*, 609 F.2d 898, 907 (8th Cir.1979) (No privilege against disclosure of self-evaluative documents prevented exchange between Equal Employment Opportunity Commission and Department of Labor of information filed by government contractors in the nature of employer reports containing information used in determining whether unlawful employment practices were being used); *McClain v. College Hospital*, 99 N.J. 346, 492 A.2d 991, 993 (N.J.1985) (confidentiality is a factor in balancing of interests used to determine discoverability).

scrutiny—scrutiny effectuated through FDA investigational device policies of reporting, inspection, review, and disclosure.

### Conclusion

Like peer review statutes around the nation, the Minnesota statute concerns *peer* reviews. The intent of these laws is to encourage physicians to criticize and review one another in an environment which is closed to civil litigants pursuing cases against the physician. The belief is that an open dialogue will result in better doctors, better policies, and better health care.

An IRB, on the other hand, does not have *peer* review as its purpose. IRB's are part of a highly regulated scheme designed to protect the rights and safety of human subjects in medical device research. The IRB does not review peers, it reviews research, approves specific investigational device exemption applications, monitors the investigation's progress, and assembles then transmits reports to the FDA. This information is ultimately used to determine whether the device will be approved or disapproved by the FDA.

Since the Minnesota statute does not address these IRB functions specifically (and even if it did, such a statute would likely be preempted by federal regulations), and since the policy of confidentiality underlying the peer review privilege is absent, this Court is persuaded that the material sought is discoverable.

Plaintiffs' motion is granted, except as to their request for costs and attorney's fees, which is denied.