809 A.2d 875 (2001)
355 N.J. Super. 226
Frank REYES as the General Administrator and Administrator Ad Prosequendum for the Estate of Debbie Reyes and Frank Reyes Individually, Plaintiff,
v.
MEADOWLANDS HOSPITAL MEDICAL CENTER, Morris R. Bellifemine, M.D., Ellis Wilcox, M.D., Hudson Physicians Associates, Iftikar Ahmad, M.D., ABC Surgeons Group I-X (said names being fictitious, true names presently unknown), Michael Vassallo, M.D., DEF Anesthesia Group I-X (said names being fictitious, true names presently unknown), John Doe, M.D. I-X (said names being fictitious, true names presently unknown), Robert Roe, M.D. I-X (said names being fictitious, true names presently unknown), James Foe, M.D. I-X (said names being fictitious, true names presently unknown), GHI Physicians Group I-X (said names being fictitious, true names presently unknown), and/or Jane Doe, R.N. I-X and/or Michael Moe, R.N. I-X (said names being fictitious, true names presently unknown), Defendants.
Superior Court of New Jersey, Law Division Civil Part, Hudson County.
Decided April 12, 2001.
*876 (Maggiano DiGirolamo & Lizzi, attorneys), Michael Maggiano, Fort Lee, for plaintiff.
(Bumgardner & Ellis, attorneys), Jared P. Kingsley, Clark, for defendant Meadowlands Hospital Medical Center.
(Buckley & Theroux, attorneys), Tess J. Kline, Princeton, for defendants Morris Bellifemine, M.D., Ellis Wilcoz, M.D., and Hudson Physicians Associates.
Francis & O'Farrell, Morristown, for defendant Michael Vassallo, D.O., Evelyn C. Farkas, Fairfield, appearing.
FUENTES, J.S.C.
This cause of action involves a claim of medical malpractice and wrongful death in which plaintiff is alleging that Meadowlands Hospital deviated from accepted standards of care in failing to properly diagnose and treat decedent, Debbie Reyes. Ms. Reyes was admitted to Meadowlands Hospital on August 1, 1998 and remained until August 23, 1998. Plaintiff alleges that in the course of an attempted laproscopic colosceptomy Ms. Reyes went into cardiac arrest and died.
This matter comes before the court by way of defendant Meadowlands Hospital's motion for a protective order under R. 4-10-3 seeking to shield from discovery certain information gathered through a process it calls "self-critical analysis." The Hospital describes this process as a "voluntary" investigation regarding the circumstances of Ms. Reyes' unanticipated death. "The purpose of such investigation is the creation of a blame-free, protective environment that encourages the systematic surfacing and reporting of serious adverse events." Co-defendants Morris Bellifemine, M.D. and Hudson Physicians Associates have joined in Meadowland's motion.
The motion was originally returnable on February 16, 2001. In the course of oral argument this court requested defendant Hospital to provide additional information as to the nature and scope of the self critical analysis employed in the Reyes case. In response, the Hospital submitted a certified statement from Harold J. Bressley, General Counsel for the Joint *877 Commission on Accreditation of Healthcare Organizations[1], and a "Sentinel Event Policy" statement outlining the protocol governing the investigation and subsequent remedial measures taken in response to the unanticipated death or serious injury of a patient.
The Hospital's self-critical analysis procedures have been established pursuant to the guidelines promulgated by the Joint Commission on Accreditation of Healthcare Organizations (Joint Commission) of a process called a "Sentinel Event." In his certification to this court Mr. Bressley gave the following description of the evolution and policy goals of this process.
In the mid-1990's, the Joint Commission began to particularly focus on the issue of medical errors or negative unanticipated outcomes and how it and accredited organizations could best act to prevent such incidents of care. It developed its Sentinel Event Policy dealing with certain categories of such incidents. A critical element of the Policy centered on health care organizations engaging in root cause analyses of such events. The basis of a root cause analysis is an industrial engineering model, and involves a thorough systems analysis to determine what, if any, systems changes a[sic] organization could put in place to make an unwanted event less likely to occur in the future. In other words, a root cause analysis is absolutely not simply an investigation of who, if anyone, did something wrong and how to punish or discipline that organization or individual. Rather it requires an intense analysis by an appropriate team within the organization of the answers to `why' question, and then a determination of whether systems can be modified to prevent the likelihood of similar events occurring in the future.
Although the Joint Commission has set the standards to be followed, it does not mandate hospitals to report the results of the Sentinel Event. Accredited organizations are merely asked to "voluntarily, without compulsion under the accreditation process, submit reports of such incidents and their root cause analyses to the Joint Commission." These data are then compiled by the Joint Commission and published, in aggregated form, to accredited organizations across the country. The Commission decided that reporting of the "root cause analysis results" would not be a prerequisite to accreditation. This decision was based on a legal concern that such reporting may be considered by a reviewing court as a waiver of any alleged confidentiality privilege. It is noteworthy that the Joint Commission has sought, but has yet to obtain, Congressional recognition of the privilege in the form of legislation.
In a policy statement effective November 1997 the Hospital adopted the Sentinel Event guidelines. The expressed purpose for its adoption was to (1) assure quality health care, and (2) comply with the Joint Commission's reporting requirements. The Hospital defines a Sentinel Event as:
an unexpected occurrence, involving death or serious physical or psychological injury or risk thereof. The phrase `or risk thereof' includes any process variation for which a recurrence would *878 carry a significant chance or a serious adverse outcome/injury. Serious injury specifically includes loss of limb or function. The event is called a sentinel because it sends a signal or sounds a warning that requires immediate attention. Within the context of serious injury or risk thereof, issues of clinical competence are not necessarily sentinel events unless initial assessment clearly identifies a process in need of improvement.
The policy statement further contains detailed procedures for the identification, investigation and formal declaration of a Sentinel Event. The Hospital is empowered to take immediate action to protect the safety of patients and staff. If this type of emergent response is not necessary, the administrator is authorized and directed to assemble an ad hoc team consisting of senior administration staff and relevant medical personnel to investigate and recommend remedial action.
A twelve step process is utilized to analyze the event and propose systemic changes to avoid recurrence. The list of potential Sentinel Events includes "unexpected iatrogenic injury (i.e., in the course of treatment) resulting or likely to result in death or major permanent loss of function (physical, psychological or reproductive)." Conspicuously missing from the policy statement, however, is any reference that the participants enjoy an expectation of confidentiality as to statements made during the process. In fact, also listed as examples of Sentinel Events which warrant process analysis are the following scenarios:
I) Infant abductions;
ii) Rape or other sexual assaults;
iii) Environmental events that injure patients/staff or require patient evacuation, such as fires and toxic spills;
iv) Events causing disruption of the hospital's ability to provide medical services, such as power outages, labor unrest and riot;
v) Media investigations or media reports involving alleged violations of regulatory agency requirements. Included in this group are events relating to compliance with the State's Department of Health, Licensing Standards, N.J.A.C. 8:43G-5.6.
There are certain principles which will inform and guide the analysis and ultimate resolution of the issues raised by this motion. I start with the basic proposition that "a party may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." R. 4:10-2(a). The term "privilege" refers to those statutorily recognized in N.J.R.E. 501 through 517. Dixon v. Rutgers, 215 N.J.Super. 333, 521 A.2d 1315 (App.Div. 1987); aff'd as modified 110 N.J. 432, 541 A.2d 1046 (1988). In Payton v. New Jersey Turnpike Authority, 148 N.J. 524, 691 A.2d 321 (1997), the Supreme Court specifically declined to recognize or otherwise create a privilege of self-critical analysis. In so doing, the Court reaffirmed the principle expressed in Dixon v. Rutgers, supra., that privileges, because they stifle the pursuit of the truth, are disfavored.
However, defendants' application to this court is not without legal support. In McClain v. College Hospital, 99 N.J. 346, 492 A.2d 991 (1985), the Court was asked to resolve a claim of executive privilege asserted by the State Board of Medical Examiners with respect to its investigation of a number of OB-GYN related deaths occurring at College Hospital. The Board characterized the scope of its investigation as going far beyond the death of the individual plaintiff in that case.
The Board states that its investigation went beyond a simple review of plaintiff's *879 decedent's hospital records and charts. According to the Board, "numerous staff and supervisory physicians were called to testify concerning their involvement in the actual care rendered to patients and the supervision of the delivery of such care." The investigation was conducted by an executive committee of the Board. It forwarded a report dealing with the deaths to the Board for its review. The report contained the executive committee's evaluation and recommendations. Also included is the report of the executive committee's consulting obstetrician-gynecologist. Id. at 352, 492 A.2d 991.
Justice O'Hern, writing on behalf of a unanimous Supreme Court, articulated the standard to be applied in assessing the need to maintain these type of records confidential.
We hold that the standard is a showing of particularized need that outweighs the public interest in confidentiality of the investigative proceedings, taking into account (1) the extent to which the information may be available from other sources, (2) the degree of harm that the litigant will suffer from its unavailability, and (3) the possible prejudice to the agency's investigation. Id. at 351, 492 A.2d 991.
It is noteworthy that the McClain court was confronted with balancing an assertion of confidentiality made by a licensing board whose statutory function includes investigations of events affecting the delivery of medical services to the public, against a claim of access to public records made by a citizen/litigant. The majority of the McClain decision was dedicated to resolving the tension presented by these two competing public interests.
By contrast, the issue presented by this motion, although couched in language promoting the advancement of medical knowledge and the improvement of medical services, also serves the litigation interests of the defendants by depriving plaintiff from reviewing what would otherwise be clearly discoverable materials. Nor is the medical profession unique in its self-ascribed role as promoters and guardians of the public's welfare. Other professions can make a similar claim, i.e., engineers, architects, scientists, ecologists, educators, even lawyers.
Two Law Division cases have been cited by defendants which have supported defendants' position, Bundy v. Sinopoli, 243 N.J.Super. 563, 580 A.2d 1101 (Law Div.1990) and Estate of Hussain v. Gardner, 264 N.J.Super. 208, 624 A.2d 99 (Law Div.1993). In both of these cases the reviewing court applied the McClain standard and found in favor of imposing a judicial restraint on this type of discovery. In Estate of Hussain, Judge Harper wrote:
... to establish precedent for the production of such files would severely prejudice the ability of St. Clares Riverside and its doctors to evaluate and criticize medical procedures in accordance with the overall public policy for improving medical care. Id. at 212, 624 A.2d 99.
Implicit in such a finding is the assumption that without this cloak of confidentiality the medical professionals taking part in this "self-critical analysis" would not have fully and candidly expressed their points of view about a given case. There is not a scintilla of evidence before me to support such a wholesale indictment of the medical profession. In fact, the current state of the law in this area supports the opposite conclusion. N.J.A.C. 8:43G-27.5 mandates hospitals to conduct medical peer review programs.
(a) There shall be an ongoing process of monitoring patient care. Evaluation of patient care is criteria based so that certain review actions are taken *880 or triggered when specific, quantified predetermined levels of outcomes or potential problems are identified.
(c) The program shall follow up its findings to assure that effective corrective actions have been taken, including at least policy revisions, procedural changes, educational activities and follow-up on recommendations or that additional actions are no longer indicated or needed.
(d) The Quality Assurance Program shall identify and establish indicators of quality care specific to the hospital that are monitored and evaluated and encompass at least:...(1) Surgical review ...
The creation and maintenance of peer review quality assurance processes are a condition of licensure by the State Department of Health. N.J.A.C. 8:43-G-2.12. The Code makes no provision for the results of such a process to be privileged. Therefore, those participating do so without any expectation of confidentiality.
Furthermore, as noted by Judge Clyne in Bundy, although the Legislature has provided for immunity from civil liability to all persons serving as members of committees responsible for the evaluation and improvement of the quality of care rendered in hospitals. N.J.S.A. 2A:84A-22.10, "The Legislature has not, however, provided for a privilege regarding the information contained within the Peer Review process." Id at 569, 580 A.2d 1101.
In contrast to the facts of both Bundy and Estate of Hussain, the internal review which is the subject of this motion, as described in the Hospital's Sentinel Event Policy Statement, includes a wide range of potential misuse in the application and/or invocation of this alleged "privilege." Although Ms. Reyes' unexpected death fits the profile of cases which warrant a thorough and honest investigation to determine what if any systematic changes are needed to avoid its recurrence, thereby improving the quality of care for future patients, the legal declaration this court is being asked to make goes far beyond these individual facts. At the heart of our legal system is the concept of stare decisis. As recently observed by Judge Arnold in Anastasoff v. United States, 223 F.3d 898, 903-04, reversed on other grounds, 235 F.3d 1054 (8th Cir. 2000), quoting Justice (Professor) Joseph Story in Commentaries on the Constitution of the United States Sections 377-78 (1833): "The case is not alone considered as decided and settled but the principles of the decision are held, as precedents and authority, to bind future cases of the same nature." Id.
A review of the examples previously listed as Sentinel Events: (I) Environmental events that injure patients/staff or require patient evacuation, such as fires and toxic spills; (ii) Events causing disruption of the hospital's ability to provide medical services, such as power outages, labor unrest and riot; (iii) Media investigations or media reports involving alleged violations of regulatory agency requirements, reveals more a desire by the Hospital to control the dissemination of potentially embarrassing information rather than a genuine interest in the enhancement of patient care. In short, these "Sentinel Events," on their face, go far beyond the professed "advancement of medical knowledge" justification argued by defendants, and wander freely in the world of public relations.
A review of the section of the administrative code cited by defendants as triggering a Sentinel Event declaration illustrates the point. N.J.A.C. 8:43G-5.6 requires Meadowlands Hospital to immediately notify the State Department of *881 Health, via telephone, of any event occurring within the hospital that jeopardizes the health and safety of patients or employees. This administrative regulation covers the following categories of events:
1) An unscheduled interruption for three or more hours of physical plant and/or clinical services essential to the health and safety of patients and employees;
2) All fires, disasters or accidents which result in serious injury or death of patients or employees, or in evacuation of patients out of the facility;
3) All alleged or suspected crimes which endanger the life or safety of patients or employees, which are also reportable to the police department, and which result in an immediate on-site investigation by the police.
b) Information received by the Department of Health through immediate notification shall not be disclosed to the public in such a way as to indicate the names of the specific patients or hospital employees to whom the information pertains.
c) A follow-up written report shall be submitted to the Department within seven calendar days of the event, unless determined not to be necessary by the Department. The written report shall contain information about the injuries to patients and/or staff, disruption of services, extent of damages and corrective action taken. (Emphasis added.)
Thus, the only provision for confidentiality reflected in the regulation pertains to information reported by the Hospital immediately by telephone. There is no comparable language with respect to any written report filed by the hospital. Furthermore, the confidentiality language is found in a subsection of category three. This category specifically refers to crimes committed within the hospital which (1) endanger the life or safety of patients or employees; (2) are reportable to the police department; and (3) result in an immediate on-site investigation by the police. The policy concern underpinning the regulation appears clear: public disclosure may interfere with or otherwise compromise on going police investigations. It is also notable that the confidentiality provision is narrowly tailored, applying only to crimes committed on hospital grounds "which endanger the life or safety of patients or employees." N.J.A.C. 8:43G-5.6(3)(b). Other than the cited language, nothing else in the Code can reasonably be construed to create a reasonable expectation that events reported by the Hospital would be considered by the Department of Health as "confidential." In fact, a reasonable person would reach the opposite legal conclusion. Under both The Right to Know Law, N.J.S.A. 47:1A-1-4, and the common law, a citizen has the right to inspect and copy public records which are not otherwise deemed confidential by law. Nero v. Hyland, 76 N.J. 213, 386 A.2d 846 (1978).
As previously noted, the standards articulated by the Supreme Court in McClain, relate directly to the need of public agencies to maintain the confidentiality of investigatory records. The Court crafted a balancing test to determine whether a litigant's private interests outweighed the possible prejudice to the public agency's investigation. In the case at bar, the private interest of the defendant Hospital is so intertwined with the professed public interest as to make the two indistinguishable. In addition, as previously noted, many of the cited examples of Sentinel Events do not serve any discernible public interest.
To the extent that Bundy v. Sinopoli, supra, and Estate of Hussain v. Gardner, *882 supra, are inconsistent with the legal conclusions reached herein, this court declines to follow their holdings. This court further finds the holding in McClain v. College Hospital, supra., to be distinguishable to the facts and legal issues raised in this case. This court holds that the Sentinel Event Policy invoked by defendant Meadowlands Hospital does not create a self-critical analysis privilege, insulating any and all discussions and statements made and conclusions reached by the participants therein and actions taken by the Hospital pursuant thereto not subject to the Civil Rules of Discovery. Defendants' application for a protective order under R. 4-10-3 is denied.
NOTES
[1] Mr. Bressley describes this organization as a non-profit corporation, chartered and headquarted in the State of Illinois. It functions through a 28 member governing board consisting of six public members and representatives from member organizations such as the American College of Physicians, the American College of Surgeons, the American Dental Association, the American Hospital Association, and the American Medical Association. It is "the nation's oldest and largest standards setting and accrediting body for health care."