752 A.2d 735 (2000)
331 N.J. Super. 529
STATE of New Jersey, Plaintiff-Appellant,
v.
Anthony BALLARD and Tony Maurice McCoy, Defendants-Respondents.
State of New Jersey, Plaintiff-Appellant,
v.
Ramona Maiolino, Defendant-Respondent.
State of New Jersey, Plaintiff-Appellant,
v.
Karim Ward and Richard Ancrum, Defendants-Respondents.
State of New Jersey, Plaintiff-Appellant,
v.
Perry H. Dickerson, Jr., Milton M. Fierro, Durman Wright, Reginald F. Smith, Luis J. Reyes, Samuel J. Betty, Alvin Grigsby, David Colon, Dondrae Dawkins, Stanley Brown, Edgar Cousar, Joe L. Barnes, Demetria M. Ferguson, Belton T. Dunlap, Gregory E. Spain, Antoine Wands, Steven L. Johnson and Che J. Durbin, Defendants-Respondents.[1]
Superior Court of New Jersey, Appellate Division.
Argued April 12, 2000.
Supplemental Briefs Filed May 9 and 22, 2000.
Decided June 8, 2000.
*736 Paul H. Heinzel, Deputy Attorney General, for plaintiff-appellant No. A-786-99T5 (John J. Farmer, Jr., Attorney General, and William H. Schmidt, Bergen County Prosecutor, attorneys; Annemarie Cozzi, Assistant Bergen County Prosecutor, of counsel and on the brief).
Leonard J. Carafa, Loti, Designated Counsel, and Edward W. Cillick, Hackensack, defendants-respondents (Ivelisse Torres, Public Defender, attorney for defendants-respondent No. A-786-99T5 Anthony Ballard; Cillick and Sprague, attorneys for defendant-respondent Tony Maurice McCoy; Mr. Carafa and Mr. Cillick, on the joint brief).
Gerard C. Sims, Jr., Deputy Attorney General, for plaintiff-appellant Nos. A-2256-99T3 (John J. Farmer, Jr., Attorney *737 General, attorney; Mr. Sims, of counsel and on the brief; Paul H. Heinzel, and Paul G. Shapiro, Deputy Attorneys General, on the supplemental brief).
William H. Buckman, for defendant-respondent A-2256-99T3 Ramona Maiolino (Mr. Buckman, on the brief and supplemental brief).
William B. Smith, Assistant Deputy Public Defender, for defendant-respondent No. A-2256-99T3, Karim Ward (Ivelisse Torres, Public Defender, attorney; Mr. Smith, of counsel and on the brief).
Mordecai D. Garelik, Assistant Deputy Public Defender, for defendant-respondent Nos. A-2256-99T3, Richard Ancrum; (Ivelisse Torres, Public Defender, attorney; Mr. Garelik, on the brief.)
Paul G. Shapiro, Deputy Attorney General, for plaintiff-appellant Nos. A-2278-99T1(John J. Farmer, Jr., Attorney General, attorney; Paul H. Heinzel, Mr. Shapiro and Michael J. Williams, Deputy Attorneys General, of counsel and on the briefs).
David P. Jacobs, First Assistant Deputy Public Defender, for defendants-respondents Nos. A-2278-99T1(Ivelisse Torres, Public Defender, attorney; Mr. Jacobs and Kevin Walker, of counsel and on the briefs).
Before Judges STERN, KESTIN and WEFING, in No. A-786-99T5.
Before Judges STERN, KESTIN and STEINBERG, in No. A-2256-99T3.
Before Judges STERN, WEFING and STEINBERG, in No. A-2278-99T1.
The opinion of the court was delivered by STERN, P.J.A.D.
Pursuant to leave granted, the State appeals from discovery orders entered by judges in Bergen, Burlington and Hunterdon counties. The orders grant defendants discovery of information they seek to support claims of "racial profiling." Pursuant to the Supreme Court's "Administrative Determination and Order" of January 31, 2000, this Part of the Appellate Division has been designated by the Presiding Judge for Administration as the Part designated to hear appeals arising from discovery orders in "racial profiling" cases involving the State Police. Because of the special designation, the common issues involved, and the impact of the claims with respect to the need for uniformity, we heard argument in all three cases simultaneously, with three judges constituting the panel in each. See R. 2:13-2(b). Judges Stern, Kestin and Wefing constituted the panel in State v. Ballard; Judges Stern, Kestin and Steinberg constituted the panel in State v. Maiolino, and Judges Stern, Wefing and Steinberg constituted the panel in State v. Dickerson. We now consolidate these appeals for purposes of this opinion.
The parties agree that discovery is required to establish a claim of selective enforcement in violation of the federal or State Constitutions, and that the threshold issue before us is whether a sufficient showing has been made in each case to justify or warrant the grant of that discovery.
After hearing the arguments in common, the respective panels conclude that there is a sufficient basis shown in the record of each case to warrant the granting of discovery in furtherance of a claim of selective enforcement of the motor vehicle laws of New Jersey by the State Police. Stated differently, we hold that the defendants involved in these appeals are generally entitled to discovery in contemplation of motions to suppress or motions to dismiss their post-arrest indictments for criminal offenses.
Consideration of the discovery orders involved in the three cases before us also generates consistent agreement among the three panels that uniformity is required with respect to the scope of discovery. Accordingly, we remand these cases to the Law Division judge designated by the Supreme Court to hear discovery motions in the first instance with respect to claims of "racial profiling" by the State Police. That judge should decide all issues concerning the scope of discovery, subject to the caveats expressed hereinafter.

*738 I.
In State v. Ballard, the State appeals from an order of the Law Division, Bergen County, entered on August 30, 1999, requiring it to produce: "1. Records (including arrest reports, radio logs, patrol charts and summonses issued) of all motor vehicle stops made by New Jersey State Troopers David Bell and Daniel DaSilva on the New Jersey Turnpike and Interstate Route 80 during the 35 days each worked prior to November 17, 1997 [the date of defendants' arrest]; and 2. the specific radio log regarding the traffic stop in this matter on November 17, 1997 by Troopers Bell and DaSilva...."
After defendant Tony McCoy's vehicle was stopped on the Turnpike for motor vehicle violations and McCoy was unable to produce a license or registration, Trooper Bell discovered four waxpaper folds containing white powder in the automobile's center console and then a chunky substance believed to be crack cocaine in a sanitary napkin bag. The substance in the four paper-folds tested negative for drugs, but the Ziploc bag revealed 6.6 ounces of cocaine. Defendants were indicted for first-degree possession with intent to distribute more than 5 ounces of cocaine and for possession of cocaine. On this appeal the State argues that "the trial court erred in granting defendants discovery of State Police records to support [their] claim of selective enforcement," because in relying upon the April 1999 Interim Report of the State Police Review Team Regarding Racial Profiling Allegations (hereinafter "Interim Report"), "the lower court relied on the standard for discovery in a selective enforcement case articulated in State v. Kennedy, 247 N.J.Super. 21, 588 A.2d 834 (App.Div.1991), rather than the standard more recently set forth by the United States Supreme Court in United States v. Armstrong, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), and applied by this court in State v. Smith, 306 N.J.Super. 370, 703 A.2d 954 (App.Div.1997)." The State further contends that, in any event, "under either standard, the lower court erred in concluding that the Interim Report established a colorable basis for granting discovery of the patrol records and radio logs pertaining to individual troopers in the absence of any proffer whatsoever that their behavior was racially motivated."
In the consolidated cases of State v. Maiolino and State v. Ward and Ancrum, the State appeals from orders for discovery entered in Hunterdon County on October 8, 1999 and November 15, 1999. The first order, finding a "colorable basis" for a claim of "selective prosecution," addresses defendants' requests for seventy-six items relating to motor vehicle stops by the State Police on Interstate 78. The second order requires the parties' experts to "confer to agree on a process of random selection" by which documents will be analyzed for 100 random dates over a period of five years, and if the parties cannot agree, "the defense may select one hundred days as a representative sample."
In Maiolino, defendant was stopped for speeding, and after a state trooper allegedly smelled marijuana emanating from Maiolino's vehicle, he obtained consent to search her vehicle. The search allegedly yielded fifteen pounds of marijuana, resulting in an indictment charging possession with intent to distribute five to twenty-five pounds of marijuana, and possession of marijuana. In the consolidated Ancrum and Ward matter, the driver of the speeding vehicle in which Ancrum and Ward were riding was stopped by State Police and consented to a search of the vehicle. The search revealed cocaine in luggage, and a search incident to the arrest revealed marijuana possessed by Ancrum. Ward and Ancrum were indicted for possession and possession with intent to distribute cocaine.
The State argues that these defendants have not met the threshold to obtain selective enforcement discovery. The State relies principally on United States v. Armstrong, supra, 517 U.S. at 465, 116 S.Ct. at *739 1487, 134 L.Ed.2d at 699, and State v. Smith, 306 N.J.Super. 370, 376-78, 703 A.2d 954 (App.Div.1997), in arguing that a defendant must show "both that the ... enforcement system has a discriminatory effect and that it was motivated by discriminatory purpose " against him or her personally or individually, requiring the defendant to "demonstrate that he or she has been the object of discrimination." In addition, the State argues that Maiolino has not even shown that she is Hispanic (as opposed to Italian), and that Ancrum and Ward were granted discovery merely because it was granted to Maiolino and they are African-Americans. Independently, the State argues that, particularly because these arrests occurred before the Interim Report was prepared, the "subsequent remedial actions" taken in response to the Report are not discoverable.
In State v. Dickerson, the State appeals from an "order of consolidation and discovery" entered on November 29, 1999 in Burlington County. The order consolidated pending indictments for purposes of discovery, permitted any defendant to join the motion, and further ordered twentyfour specific items of discovery covering stops and arrests along the entire length of the New Jersey Turnpike since January 1, 1993. In addition, the order provided that "the State may assert a claim of privilege as to individual documents, parts of documents or groups of documents" upon motion by using a "Vaughn "affidavit and index,[2] and restrained the State from interfering with any of defense counsel's efforts to speak with present or past employees of the State Police concerning racial profiling practices. The State indicates that "most defendants in this case are entitled to all relevant discovery that the law allows, subject to the limitations the law imposes," and then challenges the compelled "production of privileged, irrelevant or undiscoverable materials." The State also seeks reversal of that part of the order that requires disclosure of "prior drafts of official documents," including a draft of the Interim Report, and objects to the trial judge's denial of the State's asserted entitlement to "challeng[e] certain defendants' right to proceed in this litigation" by virtue of their failure to meet the threshold. The State also objects to automatic permission accorded future defendants to join the discovery application.
As can be seen from a thorough review of the three appeals now before us, the discovery is diverse in scopecovering only two troopers for a period of thirty-five days in Bergen County, 100 random days over five years on Interstate 78 with respect to the arresting troopers in Hunterdon County, and discovery in Burlington County of records of all stops and arrests by all troopers along the entire length of the Turnpike since January 1993.

II.
The critical issue before us relates only to discovery. Discovery is appropriate if it will lead to relevant and material information. The parties seem to agree that the requested discovery would be relevant to whether defendants can successfully move for relief based on selective enforcement of the motor vehicle laws which led to the stops in question, as well as to the conduct of police officers subsequent to the stops.
The State acknowledges that because Exits 4 through 7 of the Turnpike are in Burlington County and those exits are covered by the studies referred to in the Interim Report and State v. Soto, 324 N.J.Super. 66, 734 A.2d 350 (Law Div. 1996), defendants in Burlington County are entitled to discovery of State Police stop and arrest records, unless there was no discretion involved in the police conduct resulting in their arrests. The State contends, however, that the discovery *740 should be limited to the period after Soto was decided and to pertinent portions of the Turnpike. It also contends that those defendants who were stopped as a result of non-discretionary police conduct should not be able to delay, and as a result possibly avoid, traditional prosecution while the lengthy period of discovery and related motions involving "racial profiling" take their course. Similarly, the State contends that the defendants in Bergen and Hunterdon counties have not satisfied a "threshold" requirement entitling them to discovery in support of their selective enforcement claims.
The subject of selective prosecution was recently addressed by the United States Supreme Court in United States v. Armstrong, supra, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687. In that case, the defendants sought to dismiss a federal indictment on the grounds that they had been discriminated against by means of selective prosecution. The Court indicated that "a selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." Armstrong, supra, 517 U.S. at 463, 116 S.Ct. at 1486, 134 L.Ed.2d at 698. The burden that a defendant must meet to establish such a claim "is a demanding one." Ibid. He or she must demonstrate that the criminal laws were "directed so exclusively against a particular class" so as to amount to a "practical denial" of equal protection under the law. Id. at 464-65, 116 S.Ct. at 1486, 134 L.Ed.2d at 698 (quoting Yick Wo v. Hopkins, 118 U.S. 356, 373, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886)).
To prevail on a claim of selective prosecution, the defendant must provide "clear evidence" to overcome the presumption that the prosecutor has not acted unconstitutionally, given the general deference to which prosecutorial decisions are entitled. Id. at 465, 116 S.Ct. at 1486, 134 L.Ed.2d at 698-99. However, the requirements for showing discrimination in the prosecution process "draw on `ordinary equal protection standards.'" Id. at 465, 116 S.Ct. at 1487, 134 L.Ed.2d at 699 (citation omitted). Thus, the defendant must show that similarly situated individuals of a different class were not prosecuted for similar crimes. Ibid. Stated differently, in order to prevail on a selective prosecution claim, a defendant must prove that the "prosecutorial policy `had a discriminatory effect and that it was motivated by a discriminatory purpose,' "and that "similarly situated individuals of a different race" were treated differently. Ibid. Once a prima facie showing of a discriminatory prosecution has been made, however, " `the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result.' " Washington v. Davis, 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597, 608 (1976) (quoting Alexander v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536, 542 (1972)). See also State v. Perry, 124 N.J. 128, 166-68, 590 A.2d 624 (1991); State v. DiFrisco, 118 N.J. 253, 265-66, 571 A.2d 914 (1990) (noting that the burden of proving selective enforcement is "heavy"; defendant must prove "intentional selectivity" and "an unjustifiable basis for the discrimination").
We need not, at this juncture, consider whether there is any difference with respect to a claim of selective enforcement by arresting officers and one involving selective prosecution by the State or prosecuting attorney. We reserve for future development any differences in remedy. Nor need we decide whether there is any independent state ground to evaluate an automobile stop based on "racial profiling."[3] As noted at the outset, we are *741 now dealing only with an issue of discoveryan issue that we have addressed before in a different context.
In State v. Kennedy, 247 N.J.Super. 21, 588 A.2d 834 (App.Div.1991), the defendants, non-Caucasians, were stopped for speeding on Interstate 80 in Warren County. Drugs were found in their vehicle and they were arrested. On appeal from their convictions, the defendants claimed that the trial court erred in denying their motion for discovery of State Police records which allegedly supported their claim of selective enforcement. In addressing that issue, Judge Baime, writing for a unanimous court, held that "a defendant must establish a colorable basis for a claim of selective enforcement in order to obtain pretrial discovery of relevant items in the exclusive control of a government agency." Id. at 25, 588 A.2d 834. To do so "a defendant must present `some evidence tending to show the existence of the essential elements of the defense and that the documents in the government's possession would indeed be probative of these elements.' " Id. at 32, 588 A.2d 834 (quoting United States v. Berrios, 501 F.2d 1207, 1211-12 (2d Cir.1974)). Judge Baime added:
The threshold test we adopt here constitutes a reasonable accommodation of competing values. A more lenient standard would encourage the assertion of spurious claims of selective enforcement as a means of burdening criminal trials with massive discovery of material completely irrelevant to the defendant's case. The "colorable basis" standard is nonetheless consistent with our Supreme Court's repeated exhortations that liberal pretrial discovery practice "promotes the quest for truth."

[Ibid. (citations omitted) ].[4]
About five years after our decision in Kennedy, the United States Supreme Court decided Armstrong, supra, in which the Court specifically addressed what a defendant had to show in order "to obtain discovery in support of [a selective-prosecution] claim." Armstrong, supra, 517 U.S. at 468, 116 S.Ct. at 1488, 134 L.Ed.2d at 701. According to Chief Justice Rehnquist:
If discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim. Discovery thus imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy. The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim.
The parties, and the Courts of Appeals which have considered the requisite showing to establish entitlement to discovery, describe this showing with a variety of phrases, like "colorable basis," "substantial threshold showing," "substantial and concrete basis," or "reasonable likelihood." However, the many labels for this showing conceal the degree of consensus about the evidence necessary *742 to meet it. The Courts of Appeals "require some evidence tending to show the existence of the essential elements of the defense," discriminatory effect and discriminatory intent.
[Armstrong, supra, 517 U.S. at 468, 116 S.Ct. at 1488, 134 L.Ed.2d at 701 (quoting United States v. Berrios, supra, 501 F.2d at 1211) ].
Because Armstrong and Kennedy cite the same authority, United States v. Berrios, 501 F.2d 1207, 1211-12 (2d Cir.1974), we doubt that the two tests are substantially different.[5] In State v. Smith, supra, a case decided after Armstrong, we held that the discovery relating to a defendant's claim of selective enforcement "is permitted only when there is a colorable claim that a police agency has an officially sanctioned or de facto policy of selective enforcement against minorities." Smith, supra, 306 N.J.Super. at 378, 703 A.2d 954 (citing Kennedy, supra, 247 N.J.Super. at 29-30, 588 A.2d 834).
Assuming, for the sake of argument, that there are some differences between the tests, we now hold that the defendants before us have satisfied the "threshold" necessary for purposes of obtaining discovery in these cases under either standard. The decision of the Law Division in Soto, supra, the Interim Report, and the lack of any presentation of facts that indicated a change in the policy or practice of the State Police between the Soto decision of March 1996 and the Interim Report of April 1999, leads us to conclude that the threshold has been satisfied. We recognize that in Ballard nothing beyond the Soto opinion and the Interim Report has been presented to justify discovery, but we are told that an application to present additional statistics consistent with the Kennedy approach has been stayed by virtue of the Supreme Court's Administrative Order. However, in light of the Interim Report, we do not believe that further time and effort need be devoted to obtaining additional statistics.
In Soto, supra, 324 N.J.Super. at 69, 734 A.2d 350, the defendants moved to suppress evidence of narcotics found in their cars, based on their claim of selective enforcement. The defendants produced substantial statistical evidence tending to show the disproportionate stopping of minority motorists on the Turnpike, id. at 69-73, 734 A.2d 350, and the State was not able to refute it, id. at 73-78, 734 A.2d 350. The trial court found that these statistical disparities between the number of stops of minority drivers which one would expect and the number of stops actually conducted were "stark," and the State's attempt to respond at the hearing consisted merely of "denials and the conjecture and flawed studies" of the State's statistical expert. Id. at 85, 734 A.2d 350.
In addition, the Soto court was presented with evidence regarding training activity of the State Police throughout the State. Id. at 78-81, 734 A.2d 350. The court noted that the defendants had presented evidence that, through these training methods, "the State Police hierarchy allowed, condoned, cultivated and tolerated discrimination between 1988 and 1991 in its crusade to rid New Jersey of the scourge of drugs." Id. at 78, 734 A.2d 350. A former superintendent of the State Police admitted in an interview that "violating rights of motorists" was not nearly as important as controlling illegal drug activity in the State. Id. at 81, 734 A.2d 350. He made other comments that also supported the notion that the State Police hierarchy allowed and tolerated discrimination. Id. at 81-83, 734 A.2d 350.
In short, the defendants in Soto proved a de facto policy by the State Police of "targeting blacks for investigation and arrest between April 1988 and May 1991 both south of Exit 3 and between Exits 1 *743 and 7A of the Turnpike."[6]Id. at 84, 734 A.2d 350. The Soto court concluded that "[t]he utter failure of the State Police hierarchy to monitor and control a crackdown program [operated by the State Police] or investigate the many claims of institutional discrimination manifests its indifference if not acceptance." Id. at 85, 734 A.2d 350. Therefore, the defendants' suppression motion was granted. Pursuant to leave granted, the State appealed but subsequently withdrew its appeal from the suppression order in Soto.
In Maiolino, the defendants submitted to the trial judge statistical studies performed by Dr. John Lamberth (who designed the traffic and violator studies in Soto). He concluded that blacks comprised 4.2 percent of the motorist population on Interstate 78, and 5.9 percent of motorists on that roadway who violated the motor vehicle laws. Further, counsel for Ward and Ancrum reviewed the files of the Public Defender's Office in Hunterdon County and found that from January 1, 1998, through August 30, 1999, the office's caseload totaled 501 cases, of which 342 involved whites (68.5 percent), 114 involved blacks (22.8 percent), and 43 involved Hispanics (8.6 percent).[7] Lamberth also analyzed a list of eighty-one stops on Interstate 78 which resulted in arrests by state troopers, and he concluded that 90.1 percent of the stopped cars had at least one black in the vehicle.
In conducting a statistical comparison, Lamberth concluded that the percentage of blacks arrested on Interstate 78 who became Public Defender clients, 64.9%, was significantly higher than the percentage of blacks who comprise the general caseload of the Hunterdon County Public Defender's Office. In addition, Lamberth concluded the percentage of blacks arrested on Interstate 78 who became Public Defender clients was significantly higher than the percentage of blacks violating traffic laws on Interstate 78.
Maiolino's attorney also produced a survey conducted by Lamberth over a twoday period in July 1999, in which the number of individuals who violated motor vehicle laws on Interstate 78 was counted, as was the percentage of such drivers who were Hispanic and the overall percentage of Hispanic drivers on the roadway. Lamberth concluded that 2.5 percent of the population driving on Interstate 78 who violated motor vehicle laws were Hispanic. Moreover, the combined stop rates of Hispanics by Troopers Pantuso and Tietjen, who were involved in the arrests in the Maiolino consolidated cases, was 15.6 percent, indicating that Hispanic drivers were 7.2 times more likely to be stopped on Interstate 78 in Hunterdon County than were non-Hispanic drivers. In doing his study, Lamberth compared the surnames of those ticketed by Pantuso and Tietjen, to a well-recognized list of Hispanic surnames to determine how many of those ticketed were Hispanic.
In counting the number of Hispanics who drove on Interstate 78, Lamberth used as an observer a former police officer, Richard Rivera, who is Hispanic. Lamberth acknowledged that some individuals who are not Hispanic may have some characteristics classically linked to Hispanics and may be wrongly considered to be Hispanics. Meanwhile, others may not appear Hispanic, yet are. In order to address the possibility that the number of Hispanic violators on Interstate 78 was undercounted, Lamberth conducted statistical tests in which he assumed that fact. Even in that analysis, he concluded that Hispanics were more likely to be stopped than non-Hispanics.
Lamberth said his studies were conducted in accordance with standards acceptable in the discipline of statistical analysis and were similar in nature to those prepared by him and accepted by the court in Soto.
*744 In his written opinion granting discovery, the judge in Maiolino concluded:
In sum, although I find that the Interim Report and Soto do not in any way overrule Kennedy, nevertheless I find that Defendants have shown sufficient evidence to establish a colorable basis for a claim of selective law enforcement. All of the statistical evidence concerns the stretch of 1-78 through Hunterdon County where the subject arrests took place. The ticketing survey provides evidence that 15.6% of the tickets issued by Troopers Tietjen and Pantuso between April 1998 and December 1998 were issued to Hispanic individuals. The accompanying violator survey conducted in July of 1999 provides evidence that 2.5% of motor vehicle law violators are Hispanic. A comparison of the survey results indicates that Hispanic motorists are 7.2 times more likely to be ticketed than non-Hispanic motorists. The Court notes that this evidence obtains validity because of the violator survey, which attempts to accurately identify "the group of persons who violate the traffic laws on trooper-patrolled roads." Smith, 306 N.J.Super. at 377, 703 A.2d 954 (citing Kennedy, supra, at 33, 588 A.2d 834).
While the Court recognizes the potential for error in the surveys, nevertheless, as the court noted in Kennedy, the statistical evidence presented takes " `the question past the frivolous state and raise[s] a reasonable doubt' as to whether the State Police are enforcing the traffic laws in an evenhanded fashion without regard to non-germane racial criteria." Kennedy, supra (quoting United States v. Hazel, 696 F.2d 473 (6th Cir.1983)).
We recognize that the proofs relating to Burlington County taken from the Soto opinion and the Interim Report, as well as the proofs regarding Hunterdon County, do not touch Bergen County or the barracks that patrol that area. However, the Interim Report makes clear that troopers statewide may have been influenced by stereotypical profiles of drug couriers and may have treated minorities differently than others in making routine traffic stops and in post-stop conduct. Interim Report at 7.[8] For example, the Interim Report notes that 53% of the searches considered were of blacks, and 77% were of minorities generally. Id. at 27. The Interim Report concludes:
The potential for the disparate treatment of minorities during routine traffic stops may be the product of an accumulation of circumstances that can contribute to the use of race or ethnicity-based criteria by creating the unintended message that the best way to catch drug traffickers is to focus on minorities. To some extent, the State Police as an organization may have been caught up in the martial rhetoric of the war on drugs, responding to the call to arms urged by the public, the Legislature, and the Attorney General[`]s Statewide Narcotics Action Plans of 1987 and 1993.
We are satisfied that the State Police does not embrace an official policy to engage in racial profiling or any other form of intentional disparate treatment of minority motorists. To the contrary, the officially-stated policy has always been to condemn reliance upon constitutionally-impermissible factors. The message in these official policies, however, was not always clear and may have been undermined by other messages in both official and unofficial policies. What really matters, ultimately, is how official policies are interpreted and translated into actual practices in the barracks across the state and out on the road.

*745 As noted throughout this Report, the major problem we have found (putting aside the intentional misconduct of some troopers) is that some State Police members may have relied on stereotypes in exercising their discretion. These de facto discriminatory practices may have been unwittingly reinforced by a series of circumstances and messages that acted cumulatively and synergistically to bolster the notion that African-Americans and Hispanics are more likely than Caucasians to be transporting illicit drugs or weapons. These circumstances include:
(1) ambiguities and misunderstandings about the law (see Part IV, § B, supra);
(2) ambiguities, imprecision, and omissions in Standard Operating Procedures;
(3) conflicting, subtle messages in otherwise bona fide drug interdiction and gang-recognition training programs;
(4) the tautological use of statistics to tacitly validate pre-existing stereotypes (see Part IV, § G, supra);
(5) formal and informal reward systems that encouraged troopers to be aggressive in searching for illicit drugs, thereby providing practical incentives to act upon these stereotypes;
(6) the inherent difficulties in supervising the day-to-day activities of troopers assigned to highway patrol; and,
(7) the procedures used to identify and remediate problems and to investigate allegations of disparate treatment.

[Id. at 38-40 (emphasis added) ].
The Interim Report deals with the State Police as "an organization." The Report's observations and characterizations are not confined to the New Jersey Turnpike or a specific area of the State.
The Interim Report specifically analyzed stops and searches by officers from the Moorestown and Cranbury barracks between April 1997 and November 1998. Interim Report at 23. The stop of Ballard and McCoy in Bergen County occurred between those dates, on November 17, 1997. Likewise, Maiolino was stopped on October 15, 1998. Ward and Ancrum were stopped on March 4, 1999, before the Interim Report was filed,[9] and there is no suggestion that State Police policy with respect to profiling changed between the period of time examined in Soto and issuance of the Interim Report on April 20, 1999.
We therefore conclude that irrespective of any differences between the previously announced test for discovery under Kennedy, supra, and the federal standard subsequently pronounced in Armstrong, supra, defendants have satisfied the "threshold" in the Bergen County and Hunterdon County cases, as well as the Burlington County case. We therefore hold that they are entitled to discovery in order to pursue their claims of selective enforcement.

III.
The different scope of discovery granted in the cases emanating from three counties in our view indicates the need for uniformity. We can conceive of no reason why defendants in one county should be entitled to discovery of stop and arrest records involving all troopers in all Turnpike cases for a period of five years or more from 1993, while defendants in another county only obtain similar records with regard to two troopers for thirty-five days prior to their arrests. The disparity speaks for itself. The question before us, therefore, is how best to achieve uniformity. The answer is apparent in this case given the Supreme Court's designation of a single Law Division judge to consider *746 that issue. The designation of a single judge is warranted, particularly because expert testimony may itself be required to determine the proper scope of discovery in order to develop reliable information to evaluate a claim of racial profiling. The parties disagree, however, about our power to remand this case to the designated judge. Defendants claim that the Supreme Court's Administrative Order of January 31, 2000, precludes our remand to him.[10]
The Supreme Court's Administrative Determination and Order designates Judge Walter R. Barisonek of Union County "as the sole judge to whom all motions for discovery related to racial profiling by the New Jersey State Police shall be directed." Paragraph 2 of the order provides, however:
[T]hat the designation of said judge shall not directly apply to cases in which discovery motions have been resolved or are pending, and provided further that the consideration and disposition of all motions for discovery relating to "racial profiling" are stayed pending decision by the Appellate Division of the appeals in State v. Anthony Ballard, et al., A-786-99T5, State v. Ramona Maiolino, et al., A-2256-99T3, and State v. Perry Dickerson, et al., A-2278-99T1 and until the further Order of the Court.

[emphasis added].
We agree with defendants that the Administrative Order was designed to preclude the State from seeking reconsideration of the trial court orders entered by the judges sitting in Bergen, Burlington and Hunterdon counties in cases that were pending or resolved, such as these cases, at the time the Administrative Order was entered. However, the order only precluded such reconsideration by an application made "directly" to the designated judge or by an application which would have permitted the designated judge to reconsider the respective orders of other Law Division judges "directly." We do not read the Supreme Court order as precluding our remand to the designated judge.
It may be that the Supreme Court thought it appropriate for us to consider the need for uniformity in these cases, and we have in fact considered whether a claim of selective enforcement could be evaluated on a county by county or individual State Police barracks level. However, we reject that approach for the reasons stated above concerning the need to evaluate the policy of the New Jersey State Police "as an organization," subject to the need for particularized data the parties may develop. In any event, even if there are legitimate questions about the meaning of the Supreme Court's Administrative Order, we have little doubt that neither the Administrative Order, nor the Court's jurisprudence, would preclude the Supreme Court from remanding any pending discovery dispute to the designated judge as a matter of adjudication following a determination that such action is the most appropriate course of conduct. Cf., e.g., In re Sackman, 90 N.J. 521, 522, 448 A.2d 1014 (1982) (considering constitutionality of Rule 1:21-1 requiring nonresident attorneys to have a principal office in New Jersey); American Trial Lawyers Ass'n v. New Jersey Supreme Court, 66 N.J. 258, 259, 330 A.2d 350 (1974) (considering constitutionality of contingent-fee rule). In these circumstances, therefore, we doubt *747 that the Supreme Court's administrative determination can be understood to preclude us from reaching a similar result. Cf. State v. Linares, 192 N.J.Super. 391, 397-98, 470 A.2d 39 (Law Div.1983).

IV.
As noted, we leave to the designated judge the initial obligation to fix the scope of discovery. The traditional "abuse of discretion" standard normally employed by us with respect to review of discovery orders must, as previously indicated, be modified in light of the lack of existing rules or standards governing racial profiling cases beyond those generally embodied in R. 3:13-3 concerning discovery in criminal matters. We expect, however, that the designated judge will review the records already created in these cases.[11]
Given the arguments before us, however, we deem it appropriate as a means of promoting uniform and balanced consideration of these matters to address discovery of the following subjects briefed in these appeals.

A.
Paragraph 5 of the Dickerson order requires the State to disclose "[a]ll drafts of the Interim Report." Paragraphs 6 and 8 of the same order require the State to produce preliminary, intermediate and final drafts of any other documents dealing with allegations of profiling or the misreporting of race by officers of the State Police. Paragraphs 7 and 9 of the order require the production of data and analysis related to those drafts. The State argues that:
In each provision, the requirement that the State disclose preliminary drafts of its reports disserves the public interest by eviscerating the State's deliberative process, self-critical analysis and work product privileges. Thus to the extent that the order requires the production of privileged prior drafts, it must be reversed.
We recognize that there is no blanket privilege protecting investigative files, deliberative materials or intra-agency memoranda. McClain v. College Hosp., 99 N.J. 346, 353-54, 357-61, 492 A.2d 991 (1985); In re Liquidation of Integrity Ins. Co., 321 N.J.Super. 399, 408, 411, 729 A.2d 438 (App.Div.1999), leave to appeal granted, 163 N.J. 70, 747 A.2d 280 (2000). This is true even though "attorneys employed by [the State] participated in [an] investigation," resulting in the preparation of relevant material. Payton v. New Jersey Turnpike Auth., 148 N.J. 524, 550, 691 A.2d 321 (1997). We also recognize that privileges normally applicable in the civil setting have to be evaluated and considered in light of a defendant's rights under the Sixth and Fourteenth Amendments in connection with a criminal prosecution. See In re Farber, 78 N.J. 259, 268-69, 271-74, 394 A.2d 330, cert. denied, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978). However, the preliminary drafts of official documents or reports of a State agency are no more official pronouncements than a draft brief prepared by a legal associate for the defense attorney who is ultimately responsible for its filing. Moreover, improvement of government practices and "[a] full and free exchange of discourse would be hampered if the preliminary thought processes of agency members were bared." McClain, supra, 99 N.J. at 360, 492 A.2d 991.
While privileges should be narrowly construed because they undermine the search for truth, State v. Szemple, 135 N.J. 406, 413, 640 A.2d 817 (1994), superseded by N.J.S.A. 2A:84A-23 (regarding cleric-penitent privilege), the need for disclosure *748 of a document which is subject to a claim of privilege must nevertheless be weighed against the public's interest in the document's confidentiality. Payton, supra, 148 N.J. at 548, 691 A.2d 321; N.J.R.E. 515. Thus, although the State would have the burden of proving the applicability of a privilege, Integrity Ins. Co., supra, 321 N.J.Super. at 411-12, 729 A.2d 438, and although Sixth and Fourteenth Amendment values must be considered in determining whether the claim of privilege should be upheld, In re Farber, supra, 78 N.J. at 268-69, 271-74, 394 A.2d 330, the trial judge should not release preliminary drafts of the Interim Report in the absence of some showing of particularized need or other sufficient reasons advanced by a defendant or defendants with respect to same. In that connection, the court should consider the extent to which the underlying information may be available from other sources, the degree of prejudice the defendant will suffer from the lack of discovery of such drafts, and the possible prejudice to the State's legitimate interests in maintaining confidentiality or fosteringfull and objective self-critical analysis. See Payton, supra, 148 N.J. at 548-50, 691 A.2d 321; McClain, supra, 99 N.J. at 351, 492 A.2d 991; Integrity Ins. Co., supra, 321 N.J.Super. at 411, 729 A.2d 438 (cases seeking discovery of agency records for purposes of civil litigation); N.J.R.E. 515.
In the cases before us, defendants should have access to the same information and data the drafters of the Interim Report had in drafting that document. As we understand it, "[t]he State merely objects to producing the opinions, proposals, conclusions, findings and analyses that appear in the preliminary drafts of the report," subjects that defense counsel can develop on their own based on the same information made available to the drafters of the Interim Report. Hence, if the designated judge on remand grants the same scope of discovery of underlying data, statistics, and raw material as the judge did in Dickerson, he should limit discovery of the draft reports based on that information only to those defendants who make an actual showing of the need therefor.[12]

B.
The State asserts that paragraph 20 of the Maiolino order improperly required production of documents that were prepared and generated by the State in response to the Interim Report. The State contends that discovery of that material "is both irrelevant and contrary to public policy." We agree with the State with respect to that provision of the Maiolino order.
The offenses involved in these cases all occurred prior to the issuance of the Interim Report, and we discern no relevance in the State Police's remedial efforts, or the lack thereof, after issuance of the Interim Report.[13] Certainly the policy of the State Police, as exemplified by its training, practices and procedures; the action or inaction of superior officers upon review of misreported racial identifiers; the complaints of troopers like Sergeant James Smith (see "special report" of Sgt. James Smith of January 1996); and the "Hotel-Motel Program" designed to obtain informants on possible minority drug suspects who are staying at overnight facilities along the Turnpike,[14] which was all made *749 discoverable in the Dickerson case, should be discoverable because they show the policy and practices of the State Police at the time the stops and searches in these cases were made. That material is therefore relevant for purposes of ascertaining whether discriminatory selective enforcement occurred in these cases. Moreover, defendants will be receiving discovery of such practices, procedures and materials relating to a defined period of time in order to make a reasonable showing of discriminatory intent and effect. But we see no basis for viewing the post-Interim Report remediation as relevant to that subject. While we do not hold that N.J.R.E. 407 is controlling in these circumstances, we do note its policy of encouraging corrective action, and conclude that the discovery embodied in paragraph 20 of the Maiolino order is not probative of any issue relating to the conduct and policy of the State Police at the time of these stops.[15]

C.
The State challenges the procedure adopted by the Dickerson court with respect to testing claims of privilege asserted by the State. The judge ruled that the State had to do more than simply claim a privilege before the claim could be tested. Rather, the judge concluded that the State had to support each claim of privilege with an affidavit that had to "be provided to defense counsel because they are the ones who have a vested interest in contradicting" the claim. The judge further ruled, however, that if the State felt the affidavit could not be revealed to defense counsel, the State could submit the materials and supporting affidavit for in camera review and merely notify the defense of its endeavor to assert the privilege. The court further ruled that in using this approach, the State was required to create a "Vaughn " index listing the documents in question and the date on which an affidavit in support of the claim of privilege was filed with the court. See Vaughn v. Rosen, 484 F.2d 820, 826-28 (D.C.Cir.1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).
The State argues before us that the issue of privilege could be more expeditiously handled if the parties were required first to confer among themselves as to the State's claim of privilege, and if the State could not convince defendants of the validity of its assertion, the matter could immediately be presented to the judge for consideration. We think the procedure to be followed with respect to assertions of privilege should be developed by the designated judge. The judge should establish a procedure under which a claim of privilege can be asserted and by which the court can review the contested documents and balance the extent to which the information is otherwise available, as well as the degree of harm to a defendant and possible prejudice to the State from non-disclosure or disclosure. See N.J.R.E. 515; Payton, supra, 148 N.J. at 548, 691 A.2d 321; Loigman v. Kimmelman, 102 N.J. 98, 108-113, 505 A.2d 958 (1986); McClain, supra, 99 N.J. at 351, 492 A.2d 991; Integrity Ins. Co., supra, 321 N.J.Super. at 411-12, 729 A.2d 438; Shuttleworth v. City of Camden, 258 N.J.Super. 573, 584-86, 610 A.2d 903 (App.Div.), certif. denied, 133 N.J. 429, 627 A.2d 1135 (1992).[16]
*750 D.
The State contends that paragraphs 21 and 23 of the Dickerson order must be amended to exclude discovery of reports and allegations concerning intentional misreporting of the races of stopped motorists by three specifically named troopers because of pending criminal investigations involving those officers. The State acknowledges that closed investigative files should be made available to the defendants because they may reveal a pattern by State Police.
Without wishing to affect the final determination of the designated judge, we think it appropriate to comment that the State's position with respect to open criminal investigations has some merit. See Shuttleworth, supra, 258 N.J.Super. at 585, 610 A.2d 903. We believe, therefore, that the designated judge should consider conducting an in camera review of open investigative files to determine whether any specific defendant should have access to the files and at what time. Cf. In re Farber, supra, 78 N.J. at 275-76, 394 A.2d 330. For example, a defendant stopped by a particular trooper may have more reason and right to review an open investigative file, under some protective order, than other defendants who had no contact with that trooper, and it may be that a given motion to suppress or motion directed to selective enforcement may have to be delayed if the defendant would be entitled to information about a given officer which should not be supplied while an investigation concerning him is ongoing.

E.
Paragraph 22 of the Dickerson order requires the State to produce data with respect to the three troopers who are still the subjects of open investigations and charges. The order requires the State to produce data regarding the number of motor vehicle stops made by each of those troopers during his tenure, the number of stops resulting in the issuance of summonses or searches, "the number and race of all individuals who were stopped" indicating those searched and those not searched, and any report prepared regarding "each such stop and/or search." The State acknowledges that defendants should be provided with underlying motor vehicle stop data, but objects to having to create specific data summary reports regarding the three troopers. The State contends that it cannot be required to produce compilations of data that do not otherwise exist.
*751 The record reflects no objection on this basis before the Law Division judge but, as we believe there is merit to the concern about review of open investigative files involving these troopers, we also believe that the designated judge must revisit this subject at the same time he evaluates the claim of privilege regarding the relevant files.[17] As the State is required to produce documents regarding all motor vehicle stops on the Turnpike by State Troopers during the period to be covered by the discovery order, defendants can analyze and distill the numbers they seek rather than requiring the State to produce compilations based on those records. In other words, we see no basis for requiring the State to engage in work product that it has not itself undertaken. As long as the State produces all of the required and underlying documentation and records, it should not be required to make calculations it has not already made.

F.
As previously noted, the State's challenge to the order in the Dickerson case is limited, with certain exceptions, to the order's breadth as inclusive of the entire Turnpike and its temporal scope back to January 1993. The State seeks to limit the order's temporal scope, so as to cover only the period of time since the Soto decision was rendered. Without precluding the designated judge from developing the matter as he thinks appropriate after considering all of the relevant factors placed before him by counsel for all parties from all counties, we note only that if the discovery is going to be granted, as it was in Burlington County, to cover the entire length of the Turnpike, it makes little sense to take a provincial approach to discovery. We so conclude, independent of the need of defense counsel to examine State Police policy as a whole, because of the importance of that subject for purposes of the Armstrong test.
With respect to the time period to be covered, we appreciate the needs of the defense to develop comparative figures and note that Soto dealt with studies in 1993 relating to seventeen defendants charged with offenses that apparently occurred between April 1988 and May 1991. To follow the State's approach in seeking to preclude discovery before the date of the Soto decision would create a gap in the statistical analysis of approximately three years between the 1993 studies and the date of the Soto decision of March 4, 1996. Moreover, we are not given any basis to discern that the State Police policy changed in any significant way after the Soto opinion was filed. In fact, the Interim Report itself suggests that it did not.
Hence, we decline to endorse the State's arguments with respect to the breadth and scope of the discovery orders entered in the Maiolino and Dickerson cases, and leave that subject to be resolved by the designated judge after hearing from the State and all defendants who have filed motions for discovery in racial profiling cases.[18] We nevertheless believe that the State should have the opportunity, on a case-by-case and case-specific basis, to make a showing that the stops of individual defendants were non-discretionary, and *752 the post-stop conduct of the police was not discriminatory, and therefore the arrest could not have been the product of "racial profiling," thus precluding any efforts by such defendants to avoid traditional prosecution. We emphasize that we reject the State's contention that the defendants in Bergen and Hunterdon counties, and certain defendants in Burlington County, have not made a showing of a "colorable basis" for discovery because they have not shown that the motor vehicle stops involving them were of a discretionary nature. We nevertheless believe that the State should have the opportunity to present evidence, as we have specified on a case-by-case and case-specific basis, to show that specific stops were based on "nondiscretionary" decisions of the State Police and that the post-stop conduct was not discriminatory. The State will have the burden of establishing that the stops and subsequent conduct were non-discriminatory. But where the State can show, for example, that a stop was made after the State Police dispatcher received a report from a private citizen motorist of careless driving or some other motor vehicle violation, or of some other specific incident resulting in the motor vehicle stop, the State should have the opportunity to do so and to pursue the prosecution without the delays that will necessarily accompany discovery and applications to flow therefrom with respect to "racial profiling." If the State can show that a stop was not based upon the discriminatory decision of an officer, or the discriminatory exercise of the officer's discretion, and that the post-stop conduct was not discriminatory, the State should be permitted to do so before full discovery is required.[19]

V.
In summary, we reject the State's contentions that these defendants have not made a sufficient showing to obtain discovery of State Police practices resulting in "racial profiling." We also reject most of the contentions by the State regarding the scope of discovery. On the other hand, we believe that disparity from county to county with respect to the scope of discovery is unwarranted and unjustified. Therefore, subject to our general comments made herein, we remand these matters to the designated judge appointed by the Supreme Court to entertain discovery applications in "racial profiling" cases and to develop uniform policies and procedures with respect to such discovery. Any issues raised before us which we have not addressed in this opinion shall be presented in the first instance to the designated judge.
The orders under review are remanded for further consideration by the designated judge. We do not retain jurisdiction.
NOTES
[1] Although separate indictments are involved in the consolidated Burlington County cases, we have listed the defendants together for purposes of this caption.
[2] See Vaughn v. Rosen, 484 F.2d 820 (D.C.Cir. 1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).
[3] As Armstrong involved a federal prosecution, it dealt with the Due Process Clause of the Fifth Amendment. However, in discussing equal protection principles in that context, it cited cases involving federal constitutional review of state prosecutions. United States v. Armstrong, supra, 517 U.S. at 464-66, 116 S.Ct. at 1486-87, 134 L.Ed.2d at 698-99. It has been said by the United States Supreme Court that "[t]he central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." Washington v. Davis, supra, 426 U.S. at 239, 96 S.Ct. at 2047, 48 L.Ed. 2d at 607 (citation omitted). See also Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89, 98 (1996), noting that "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment."
[4] Kennedy appears to have been decided under the Due Process and Equal Protection clauses of the federal Constitution. Id. at 29, 588 A.2d 834.
[5] As noted previously, Armstrong involved a federal prosecution, and we need not discuss the extent to which the discovery requirements noted therein should apply to the states.
[6] As already noted, exits 4 through 7 are in Burlington County.
[7] The race of two defendants could not be discerned.
[8] We are citing the Interim Report as contained in the Maiolino appendix because that is the pagination of the copy of the report most frequently appended to the various papers submitted to this court. We note, however, that there is at least one other version of the Interim Report with different pagination.
[9] No case before us arose after the Interim Report was filed or after the event which led to the study resulting in the Interim Report, an April 23, 1998 shooting on the Turnpike. See Interim Report at 1.
[10] In supplementary briefs addressing our concerns about the need for uniformity raised at oral argument, defendants in the Maiolino and Dickerson matters insist that uniformity can be achieved by providing every defendant what they received in the discovery orders under review and that, in any event, the Supreme Court's Administrative Order precludes our remand of these cases to the designated judge for reconsideration of the discovery orders under review. If the latter proposition were true, defendants Ballard and McCoy could not obtain broader discovery that may flow from the designated judge's consideration of the record developed in these cases and the orders he may enter hereinafter.
[11] There may be unique reasons to make exceptions to the general discovery orders with respect to specific areas or counties. In any event, given the consideration of these respective matters by judges aware of the individual facts and circumstances of the given cases, the designated judge must consider the reasons given for the discovery orders entered before making an ultimate decision with respect to discovery in these respective cases.
[12] The State also objects to the discovery of drafts of other reports, but without specificity regarding the reports that exist and were made discoverable under the Dickerson order. We do not comment thereon and leave the subject to initial development by the designated judge subject to the principles embodied herein.
[13] The Interim Report is itself a remedial effort with respect to these pre-report arrests. However, defendants were granted discovery of documents "resulting from and/or related to the interim report and/or any of its conclusions and/or proposals and/or the implementation of the same directed to members of the New Jersey State Police and/or their supervisors."
[14] We leave for the parties to develop, and the judge to decide, the scope of such discovery keeping in mind the need of the State to protect its investigative techniques.
[15] We note that the trial judge in Dickerson, while granting broad discovery, denied a similar request for discovery of documents regarding remedial action of the State Police following issuance of the Interim Report.
[16] Some of these cases deal with a third party's request for access to public documents and information. In one such case, Shuttleworth v. City of Camden, supra, we quoted another in stating:

In Loigman, supra, 102 N.J. at 108-112, 505 A.2d 958, our Supreme Court determined that the "exquisite weighing process by the trial judge" must consider the parties' assertions regarding access and confidentiality and decide whether in camera review by the court is appropriate. If the trial court finds it appropriate, it should require the governmental body seeking to maintain the confidentiality of law enforcement records to "classify, describe and, in some cases, index the materials," a procedure described in Vaughn v. Rosen, 484 F.2d 820, 826-828 (D.C.Cir.1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). Loigman, supra, 102 N.J. at 109, 505 A.2d 958.
If the court deems it necessary to view the materials in camera, it will thereafter make a final determination as to whether, by further excision or deletion of privileged and confidential materials, it can appropriately order the materials released. In doing so, some of the considerations that may be examined will include: (1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to valuative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials. [citations omitted.] Against these and any other relevant factors should be balanced the importance of the information sought to the plaintiff's vindication of the public interest. [Loigman v. Kimmelman, supra, 102 N.J. at 113, 505 A.2d 958].
[Shuttleworth, supra, 258 N.J.Super. at 586, 610 A.2d 903.]
[17] As we have already noted, while the State acknowledges that most defendants stopped on the Turnpike in Burlington County are entitled to most of the discovery ordered, it objects to the period of time covered by the order, as well as to discovery being permitted for the entire New Jersey Turnpike. The State seeks to limit discovery to the period between the date Soto was decided and publication of the Interim Report. As also previously noted, we leave the initial decision on these matters to the designated judge.
[18] Without passing upon the issue, we note that the defendants in Ballard did not seek to cross-appeal from the Bergen County order and that reference has been made to us in these cases with respect to more limited discovery orders which may have been entered in other counties. Ballard, as one of the cases before us, is being remanded to the designated judge. We do not now address the procedure by which orders entered in other cases may be reconsidered.
[19] Nothing we say herein detracts from the State's burden of proof necessary to sustain the warrantless search, see, e.g., State v. Cooke, 163 N.J. 657, 664, 751 A. 2d 92 (2000) in cases in which full discovery is required with respect to the selective enforcement-racial profiling issue.